John Jeff LaGORGA, a minor, by Joseph LaGorga, his guardian, and Joseph LaGorga and Bernadette LaGorga, Plaintiffs,

v.

The KROGER COMPANY, a corporation, Defendant and Third-Party Plaintiff,

v.

Sidney H. EVANS, Individually and trading and doing business as Evans Manufacturing Company, and Evans Manufacturing Company, Inc., Third-Party Defendants and Fourth-Party Plaintiffs,

v.

LOWENSTEIN AND SONS, INC., a corporation, Fourth-Party Defendant.

Civ. A. No. 65–66.

United States District Court
W. D. Pennsylvania.

Nov. 1, 1967.

Robert B. Ivory, and Paul Moses, of Evans, Ivory & Evans, Pittsburgh, Pa., for plaintiffs.

Bruce R. Martin, Pittsburgh, Pa., for defendant.

Wallace E. Edgecombe, of Royston, Robb, Leonard, Edgecombe, Miller & Shorall, Pittsburgh, Pa., for third-party defendants.

## OPINION AND ORDER

MARSH, District Judge.

This is a diversity personal injury case arising under the law of Pennsylvania. The defendant, Kroger Company, brought in Sidney H. Evans and his corporation as third-party defendants. Evans and his corporation brought in Lowenstein and Sons, Inc. as a fourth-party defendant. During the trial Mr. Evans and his corporation moved to discontinue their fourth-party action against Lowenstein and Sons, Inc., who made no objection, and the motion was granted. Rule 41(a) (2), Fed.R.Civ.P.

The case was submitted to the jury who returned verdicts in favor of John Jeff LaGorga, the minor plaintiff, and his parents, on which judgments were entered.[1] The jury returned a special verdict in favor of the third-party defendants on which judgment was entered.[2]

In the main case Kroger moved for judgments notwithstanding the verdicts and joined a motion for a new trial. In the third-party action Kroger moved for a new trial. In our opinion, all Kroger's motions should be denied.

The complaint, basing liability on breach of warranty and negligence, alleged that Kroger, while engaged in the business of selling foods and clothing, sold a child's jacket to Mildred M. Lettieri, a relative of the minor plaintiff, who gave it to him; that this jacket, its fabrics and its component parts were dangerous and highly flammable; that due to this condition, the jacket became ignited while being worn by the minor plaintiff, resulting in injuries to him and damages to his parents.

Strict liability in tort became the law of Pennsylvania when the Supreme Court adopted § 402A of the Restatement, Torts 2d (1965). Webb v. Zern, 422 Pa. 424, 220 A.2d 853 (1966).[3] Strict lia-

---

1. The verdicts were in the sum of $193,-000 for the minor plaintiff and $26,530 for his parents. No claim is made that the verdicts are excessive.

2. In answer to an interrogatory, the jury found that Mr. Evans and his corporation did not manufacture and sell to Kroger the jacket worn by the minor plaintiff.

3. "§ 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

bility evolved from the action for breach of warranty (originally a tort action, Vanleer v. Earle, 26 Pa. 277, 279), but shorn of the verbiage and complications of warranty law; [4] strict liability reduces the difficulty of injured victims in proving negligence of sellers of products and shifts the risk of loss for defective products from the ultimate user to those who put such products on the market. Strict liability is a vehicle of social policy.[5]

The main case was tried as a strict liability action inasmuch as we thought there was insufficient evidence to support the negligence counts,[6] and the count for breach of warranty was eliminated on the ground of lack of privity.[7] In the third-party action the court ruled that only one issue of fact would be tried, i. e., whether or not the manufacturer of the jacket involved was Sidney H. Evans and his corporation. Rule 42(b), Fed.R.Civ.P.; R., pp. 995–996, 998–999, 1015.

*Motion for Judgment N. O. V.*

■ Accepting as true all the facts and reasonable inferences to be drawn

therefrom in the light most favorable to the plaintiffs, as required, we think the plaintiffs proved a case of strict liability against Kroger. Several arguments advanced by Kroger appear to be predicated on a view of the evidence most favorable to it, which is contrary to the established rule. Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944); Ferraro v. Ford Motor Company, 423 Pa. 324, 223 A.2d 746 (1966); Hardiman v. Pittsburgh Rys. Co., 339 Pa. 79, 14 A.2d 72 (1940).

The evidence reveals that on April 26, 1963, around 4:00 o'clock in the afternoon, three small children, including the minor plaintiff, were on the premises of a public school in North Versailles Township, Allegheny County, Pennsylvania, playing around a metal barrel in which school refuse was burning. The school employee who started the fire had left the premises without extinguishing it.[8]

John Jeff was wearing one of three jackets which Mrs. Lettieri in the fall of 1962 had purchased for $2.98 each at Kroger's Food Store No. 193 in McKees-

---

(2) The rule stated in Subsection (1) applies although

    (a) the seller has exercised all possible care in the preparation and sale of his product, and

    (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

4. See: Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049 (1963); Restatement, Torts 2d, § 402A, comment m; Prosser, "The Assault Upon The Citadel", 69 Yale L.J. 1099 (1960); Prosser, Torts, § 97 at pp. 678, 681 (3d ed. 1964); Wade, "Strict Tort Liability of Manufacturers", 19 Sw.L.J. 5–11 (1965).

5. Prosser, op. cit. supra f. n. 4, at p. 673; Restatement, Torts 2d § 402A, comment c: "[P]ublic policy demands that the burden of accidental injuries caused by products * * * be placed upon those who market them * * *; and that the consumer [user] of such products is entitled to the maximum of protection * * *." Moreover, strict liability should be imposed to protect public life and

health. See: Suvada v. White Motor Company, 32 Ill.2d 612, 210 N.E.2d 182, 185–186 (1965). "Each year in the United States alone more than 8,000 persons die from burns and another 300,000 are hospitalized. A special heartbreak is that 40 per cent of these victims are children under 10 years of age. Many are crippled and scarred for life." James H. Winchester, "New Techniques Improve the Care of Burns", The Modern Hospital, Vol. 108, No. 3, p. 101 (March, 1967).

6. Plaintiffs withdrew their claim of negligence (R., p. 977).

7. Pretrial procedure demonstrated that Mildred M. Lettieri was not in the family of John Jeff LaGorga within the meaning of the Uniform Commercial Code, 12A Purdon's Pa.Stat.Ann. § 2–318, as interpreted by Miller v. Preitz, 422 Pa. 383, 221 A.2d 320 (1966). She was a second cousin, did not live near him, and did not personally deliver the jacket to him, but had it delivered to him as a Christmas present by Mrs. Lucy Severino, his aunt.

8. The School District was eliminated as a fourth-party defendant on its motion for summary judgment.

port, and which she had sent to him as a Christmas present. The jacket was not packaged and was displayed on a table with other similar unpackaged jackets in the store. The jacket was not labeled; there was no identity of the fabrics used in its outer shell, interlining or padding, and inner lining;[9] there was no warning that it had not been treated with flame retardant. Mrs. Lettieri, a long-time employee of Kroger Company, at the time she purchased the jacket was the chief cashier at its store No. 193 in McKeesport.

The jacket was designed with a cotton shell, interlining or padding of mill waste comprised of 50% acrylic fibers and 50% unknown material interspersed with air pockets, and an acetate inner lining. It had a hood of the same components and a zipper down the front.

On the day of the accident, John Jeff, Linda Lenart, and another child were poking sticks through holes in the metal barrel. Linda testified that a spark started to burn a nickelsize hole on the front of John Jeff's jacket. She tried to extinguish the burning fabric by rubbing dirt on it; failing, she tried to pull down the zipper, but it stuck. In panic, John Jeff ran a short distance toward his home. As he ran he was observed, eventually thrown to the ground, and with considerable difficulty the fire was extinguished. An ambulance was called and he was taken to the hospital where miraculously he survived burns covering 80% of his body, 40% of which were third-degree burns.

Linda also ran home in panic, telling her father that sparks flew out of the barrel onto John Jeff's clothes and a spark started a fire on his jacket. She told her mother that she could not get the zipper down because "it was stuck".

Darryl Roher and William Popovich, aged about 14 at the time of the event, observed John Jeff running from the school yard toward his home. Darryl testified:

"You could see the flames shooting out the back of the jacket * * * as if he was a jet, because there was a big flame shooting out the back of the jacket." He testified: "Well, they got a blanket around him, I remember, and Mr. Samosky would reach under this blanket and pull out a handful of coat that was burning, and he would throw it. And, it seemed like as soon as it hit the ground, that it would go up in flames again, or as soon as it hit the air it would start to flame." He testified that a coat and a throw pillow used by others in an attempt to extinguish the fire were practically consumed.

William Popovich testified that he saw Mr. Samosky pulling parts of the jacket out from underneath a blanket. He said: " * * * [T]hey were smoldering. When they hit the air, they would start burning again. * * * Well, first they would burn rapidly, and then they would taper off, and then they would smolder." In response to the question: "Had you ever seen any cloth that burned like that before?", he answered: "Nothing like that."

When the burning boy was thrown to the ground, the frantic efforts by adults to extinguish the burning jacket were frustrating. A coat thrown over him, a pillow and a blanket were ineffective to prevent the jacket from being practically consumed.

Mrs. Dellinger heard John Jeff screaming and saw him running in her direction. She went to his aid. She testified: "Well, as I ran towards him, the flame was shooting out from the front jacket. * * * I wrapped or threw my coat around him. * * * [The fire] was shooting out in front of him. * * It was very intense. * * * I didn't think cloth would burn like that, not the way the fire just shot out, I would say, about a foot and a half from his chest. * * * From what I saw, it was terrific. That is the one thing that sticks in my

---

9. The supplier of the interlining, Marvel Quilting Co., and the supplier of the inner lining, Grayson Fabrics, Inc., were eliminated as fourth-party defendants on their motions to dismiss.

mind, when he was coming towards me and that fire was shooting out."

Mr. Samosky, a retired volunteer fireman of 25 years' experience, while looking through a window saw " * . * * somebody coming down the street full blaze, up over his head, just like a ball of fire coming down." He went to the boy's aid with a throw pillow. He testified: "I hit him with that pillow right across the stomach. But, that didn't phase the fire. That pillow, when I hit him, sounded like a blow torch, just like putting air into a blow torch. It would just go zoom. * * [I]t looked like the blazes was up over his head." Mr. Samosky eventually succeeded in throwing the boy to the ground and with his bare hand "got a handful of that stuff, and it all gave away. * * * And, I throwed that down on the ground, and it ignited again and come up about that high off the ground." He indicated a foot or a foot and a half. "Just a handful of that stuff. And, the only way that it loosened up was because the top cloth was already burnt, and I got the stuff inside, and that was ignited. So, that is why I just glanced at it and seen it coming right up." A baby blanket was provided by someone and Mr. Samosky covered the boy with it, but the fire came out from underneath the blanket. He testified that the jacket was entirely burned; that in his experience as a fireman "no cloth that I have seen burned like that. * * * It was a hot and large flame."

■ From the lay evidence the jury could have found that the burning behavior and characteristics of this particular jacket were unusual and dangerous;

that it was made of flammable materials which ignited easily, burned rapidly and intensely with a high degree of heat, and were difficult to extinguish. The lay evidence supports the finding of the jury that the jacket was unreasonably dangerous. None of its remains were tested by the parties. Cf. Knab v. Alden's Irving Park, Inc., 49 Ill.App.2d 371, 199 N.E.2d 815 (1964). It was stipulated by all parties that the jacket conformed to or was not in violation of the Federal Flammable Fabrics Act, 15 U.S.C.A. §§ 1191 et seq., which stipulation was some evidence that the design was not unreasonably dangerous. See: Commentary on Flammable Fabrics Act by Maurine B. Neuberger, Consumer Consultant, Department of Labor, Trial, April/May, 1967, p. 44.

The plaintiffs' expert, Dr. Beroes, who tested a "similar" jacket (Ex. 4), established that the synthetics used in the exhibit tend to melt rather than burn to ash and produce high temperatures; also, that when ignited and not immediately extinguished, severe and deep burns are inflicted upon the body of the wearer.[10] Since there was doubt that Exhibit 4 was made by the manufacturer of the LaGorga jacket, the former's burning characteristics were not necessarily those of the latter.[11]

We think it is no answer to say that the burning characteristics of John Jeff's jacket were generic to all other jackets made for children by various sellers. There was no proof that jackets designed by all other manufacturers had the same burning characteristics as the jacket here involved. No one tested "other jackets"

10. A bulletin of the National Safety Council entitled "Flammability of Wearing Apparel", copyright 1959, revised 1964, points out:

"In most cases, when the synthetic fibers are exposed to heat, they will tend to soften. Some will actually melt and form a syrupy liquid, or a sticky, tar-like substance. This property of some fibers can cause more serious burns than fibers which do not become sticky or melting."
"Combinations of cotton and synthetic fiber or rayon and synthetic fiber can be

quite hazardous. The cotton or rayon portion supports combustion readily, while the synthetic fibers can melt into a hot, sticky, tar-like substance. The result would be severe, deep burns. Extreme caution should be exercised in purchasing fabrics of this type."

11. Exhibit 4 was purchased by a Mrs. Basa at a different Kroger store in the spring of 1963. There was evidence that Exhibit 4 was not made by the manufacturer who made the LaGorga jacket. See discussion at page 19, infra.

on the market under the precise conditions which attended the burning of John Jeff's jacket. There was evidence that 80%–90% of cotton fabric is treated with flame retardant substances, but the cotton outer shell of this jacket was not so treated. The evidence showed that treatment of the cotton outer shells of jackets with flame retardant would add to their cost only a few cents (R., pp. 715, 775–776), and their usefulness would not have been impaired.[12]

In addition, even if the LaGorga jacket was generic with other jackets of the same composition and design, such would not warrant granting the motion for judgments n. o. v. As quoted in Pritchard v. Liggett & Myers Tobacco Company, 295 F.2d 292, 297 (3d Cir. 1961), and in Lavelle v. Grace, 348 Pa. 175, 34 A.2d 498, 502, 150 A.L.R. 366 (1943):

" '[W]hat usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not.' Texas & Pacific Ry. Co. v. Behymer, 1903, 189 U.S. 468, 470, 23 S.Ct. 622, 47 L.Ed. 905 * * *."

And in MacDougall v. Pennsylvania Power & Light Co., 311 Pa. 387, 166 A. 589, 593 (1933):

" * * * [A] person while he may take counsel of custom should also take counsel of his common sense and of his judgment. In the long run usage must conform to reason."

In The T. J. Hooper, 60 F.2d 737, at p. 740 (2d Cir. 1932), Judge Learned Hand stated:

" * * * [A] whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission."

To an ever-increasing extent in this day of synthetic living, the population is dependent on mass producers for its wearing apparel. The composition and qualities of combined fabrics are not generally known. Greater care and integrity is required by society from sellers, as well as increased caution for the safety and well-being of all users, especially the child consumer. Where experiment or research is necessary to determine the presence or the degree of unusual danger in a child's jacket, the product should not be tried out on those who wear it. The public cannot be expected to possess the facilities or technical knowledge to apprehend inherent or latent dangers. The decisive factor is the condition of the product which a jury might find to be defective and unreasonably dangerous in foreseeable circumstances. Sellers do have duties to the public. They have no greater right to place on the market a product which may foreseeably cause harm than does a drunken driver to operate an automobile. It is established in Pennsylvania that a manufacturer has a duty to make a product "safe for ordinary, foreseeable circumstances". Wilson v. American Chain & Cable Company, 364 F.2d 558, 560 (3d Cir. 1966).

Inherent in the verdicts are the factual findings that the LaGorga jacket was sold by Kroger at its store No. 193 in McKeesport, and that it was in substantially the same condition at the time of the accident as it was when it was sold. With respect to these findings, Kroger does not raise any question. (See its brief, p. 27.)

In our opinion the evidence posed other important issues of fact for the determination of the jury since they were such that reasonable men could differ. Among these, the jury found (1) that the jacket was defective and unreasonably dangerous; (2) that the unreasonably dangerous jacket was the proximate cause of the injuries; (3) that the jacket was not reasonably safe for normal wear by a young child; and (4) that it was foreseeable by Kroger that such a child might

12. Cf. Wade, supra f. n. 4, at p 17.

play with or around fire and such was not abnormal wear of the jacket. See: Noel, "Manufacturer's Negligence of Design or Directions for Use of a Product", 71 Yale L.J. 816, at pp. 855–866 (1962). It goes without saying that if the jacket was not reasonably safe, such would be beyond the contemplation of a five-year-old child user and he could not be held to have assumed the risk. We think the findings of the jury should stand.

Kroger points out that under § 402A liability is predicated on a defective condition and contends that there is a complete absence of evidence that the La-Gorga jacket was ever in a defective condition and, therefore, plaintiffs' case falls (Kroger brief, p. 31). We do not agree.[13]

Of course, the usual situation occurs when faulty manufacture results in something wrong with the product. But the basic design of a product, perfectly manufactured, is defective if it results in an unreasonable dangerous product for then an unreasonably dangerous product is synonymous with a defective condition.[14] Thus there are two categories of defective products: (1) where a defect in the product results from a miscarriage of the manufacturing process, and (2) where the intended design of the product can be found to make the product unreasonably dangerous or not reasonably safe.[15] In

this connection, it is to be noted that the LaGorga jacket could have been made safe for wear by a child by fireproofing its cotton outer shell; it was not impractical or impossible to make the jacket safe in this respect; the jacket was not an unavoidably unsafe product as are some drugs or a blood transfusion.[16]

*Motion for New Trial in Main Case*

Among the several alleged trial errors, Kroger urges that evidence of the hard-to-work zipper, and evidence that the jacket was untreated with flame resistant chemicals, were facts not disclosed by plaintiffs in the pretrial proceedings, and, therefore, the testimony pertaining thereto should have been stricken. It cites Local Rule 5–II–G which requires that the substance of a party's evidence as to liability be disclosed in his pretrial narrative statement or at the pretrial conference.

Of course, all parties, prior to any pretrial proceedings, certainly knew that the jacket had been made with a zipper. The fact that the zipper "stuck" when Linda Lenart attempted to pull it down was brought out first by Kroger on cross-examination of Linda Lenart (R., p. 297). Lowenstein and Sons, Inc., the fourth-party defendant, quite naturally believed it had been handed an unexpected defense to its alleged liability over, and subse-

---

13. A literal reading of § 402A seems to support Kroger's contention, but some courts have used "defective product" and "unreasonably dangerous" interchangeably, e. g., Jakubowski v. Minnesota Mining and Manufacturing, 42 N.J. 177, 199 A.2d 826 (1964), and it has been argued that the terms have the same meaning. Wade, supra f. n. 4, at pp. 14–15.

14. The products in the following cases seem to have been perfectly made as intended: Greenman v. Yuba Power Products, Inc., 377 P.2d 897 (set screws on power tool); Knab v. Alden's Irving Park, Inc., 199 N.E.2d 815 (boy's trousers); Frank R. Jelleff, Inc. v. Braden, 98 U.S.App.D.C. 180, 233 F.2d 671, 63 A.L.R.2d 400 (brunch coat); Hardman v. Helene Curtis Industries, Inc., 48 Ill.App. 2d 42, 198 N.E.2d 681, 12 A.L.R.3d 1033 (hair spray); Spruill v. Boyle-Midway, Incorporated, 4 Cir., 308 F.2d 79 (furniture polish); Pritchard v. Liggett &

Myers Tobacco Company, 3 Cir., 295 F.2d 292 (cigarettes); Carpini v. Pittsburgh and Weirton Bus Company, 3 Cir., 216 F.2d 404 (pet cock on bus); Brown v. Chapman, 9 Cir., 304 F.2d 149, 4 A.L.R. 3d 490 (skirt); Moran v. Pittsburgh-Des Moines Steel Co., 3 Cir., 183 F.2d 467 (cylindrical storage tank); Smith v. Hobart Manufacturing Company, 3 Cir., 302 F.2d 570 (meat grinder); Hubbard-Hall Chemical Company v. Silverman, 1 Cir., 340 F.2d 402 (insecticide); Wright v. Massey-Harris, Incorporated, 68 Ill.App. 2d 70, 215 N.E.2d 465 (corn picker). In Greenman and Wright strict liability was applied; in the other cases, liability was expressed in terms of breach of warranty and negligence.

15. Cf. Wade, supra f. n. 4, at pp. 14–16; Noel, supra, 71 Yale L.J. at pp. 816–819.

16. Cf. Restatement, Torts 2d, § 402A, comment k.

quently the condition of the zipper was probed by its counsel in the cross-examination of Mr. LaGorga (R., pp. 617–618) and Mrs. LaGorga (R., pp. 634–635). Plaintiffs' counsel attempted to exploit the point in his examination of Mr. and Mrs. LaGorga and it became a controversial factual issue in direct and cross-examination of the parent plaintiffs (R., pp. 618–628, 635–645), with all counsel and the court participating.

■ We think that the testimony relating to the hard-to-work zipper on the jacket involved was not surprise testimony which should have been excluded under the Local Rule. It was a condition of the jacket and an attendant circumstance available to all parties by way of pretrial discovery. Deliberate concealment was not apparent. In any event, Kroger was not prejudiced, for the plaintiffs were prohibited from relying on this unexpected trial disclosure as a *new theory* to impose strict liability upon Kroger. The court expressly instructed the jury that if it were found that the zipper was defective, it was not unreasonably dangerous and this defect could not be a basis for a verdict against Kroger (R., p. 1559). In the circumstances we think it was not error to refuse to strike this evidence.

A strong inference arose from the ignition and burning of the jacket involved that it had not been treated with flame retardant. This, like the zipper, was a condition of the jacket and an attendant circumstance. There was no concealment. Any interested party at pretrial could have verified this condition by requesting an examination of Exhibit 3. This condition was a relevant circumstance for the jury to consider along with all other characteristics of the jacket. Moreover, we think the demonstration of the efficacy of flame retardant chemicals applied to samples of fabrics to prevent their burning was properly explanatory of the testimony of Dr. Beroes, plaintiffs' ex-

pert, as was his attempt to burn a sample of wool. Cf. Frank R. Jelleff, Inc. v. Braden, 98 U.S.App.D.C. 180, 233 F.2d 671, 680, 63 A.L.R.2d 400 (1956).

■ The testimony of Dr. Beroes that 80% to 90% of cotton fabric was treated with flame resistant substances was not contradicted. We think this testimony was relevant to the issue of whether or not a jacket having the burning behavior of the jacket worn by John Jeff was defectively designed and unreasonably dangerous. It was relevant in that a widely used safeguard might have been feasible, practical, inexpensive, and effective to prevent burning accidents to young children.[17] It was relevant to enable the jury to arrive at a standard of care for suppliers of jackets for young children. As was done in the hard-to-work zipper issue, Kroger's rights under the Local Rule were protected, and the plaintiffs were foreclosed from relying on this trial disclosure as a *new theory* to impose strict liability upon Kroger. The court expressly instructed the jury that the lack of flame retardant in itself was not a defective condition of the jacket on which the jury could find a verdict against Kroger (R., p. 1560). We think it was not error to refuse to strike this evidence.

The defendant challenged the competency of Linda Lenart as a witness. After examination, the court found that this eight-year-old child had the capacity to recollect the impressionable events surrounding the burning of John Jeff's jacket which occurred in 1963, when she was a few days over five years old; to understand questions put to her; to give rational answers; and to know that she ought to speak the truth. Cf. Piepke v. Philadelphia & R. Ry. Co., 242 Pa. 321, 89 A. 124, 125–126 (1913); Doran v. United States, 92 U.S.App.D.C. 305, 205 F.2d 717 (1953); West v. Sinclair Refining Co., 90 F.Supp. 307 (W.D.Mo. 1950); Knab v. Alden's Irving Park, Inc., supra; McCormick, Evidence, § 62,

---

17. If the manufacturer could provide a safeguard which would make the jacket substantially safer for children to wear without prohibitive cost, marketing the jacket without such safeguard would seem unjustified. See Wade, supra f. n. 4, at pp. 17–18.

pp. 140–141 (1954 ed.); but see Rosche v. McCoy, 397 Pa. 615, 156 A.2d 307, 81 A.L.R.2d 377 (1959).

█ █ The child was unusually bright and alert. When she did not know the answers to questions, she remained silent. We think her testimony and her res gestae declarations made to her mother and father were for the consideration of the jury which had the duty to reconcile inconsistencies. Likewise, her credibility and the weight of her testimony were for the jury, notwithstanding that she was impeached to some extent by a statement she made in the preliminary hearing, absent jury, to determine her competency; and notwithstanding that there were inconsistencies in her testimony.[18] A fair jury might reasonably infer from Linda's testimony that a spark or something that looked like a spark came from the fire in the barrel and ignited John Jeff's jacket. We realize that the child contradicted herself under expert cross-examination, not corruptly, but in an honest effort to tell the truth; as a rule, youthful witnesses much older than Linda are easily confused. Van Zyl v. Neitch, 116 Pa.Super. 68, 176 A. 31 (1935). In any event such conflicts present issues as to credibility which should be left to the determination of the jury. Bailey v. Pittsburgh Railways Company, 414 Pa. 238, 199 A.2d 460 (1964); Girard Trust Corn Exch. Bank v. Philadelphia Transp. Co., 410 Pa. 530, 190 A.2d 293 (1963); Weidemoyer v. Swartz, 407 Pa. 282, 180 A.2d 19 (1962); Cericola v. Redmon, 182 Pa.Super. 19, 124 A.2d 417 (1956); 88 C.J.S. Trial § 214 c(2), p. 489; § 215 c(2), p. 497; § 214 e, p. 492.

Kroger attributes error to the court "in permitting the plaintiffs to abandon" their pretrial position that the jacket involved had been manufactured by Evans and his companies "and, to contend, at trial, that it was not manufactured, and supplied" to Kroger by Evans. We are not aware of any place in the record (1) that the court gave such "permission" to plaintiffs, or (2) that Kroger objected to the alleged change in position.

█ Before the trial began plaintiffs obtained an order of court[19] permitting them to voluntarily dismiss their action brought against Evans Manufacturing Company, Incorporated, at Civil Action No. 65–286. Rule 41(a) (2), Fed.R.Civ. P. There was no objection on behalf of Evans Manufacturing Company, Incorporated. Kroger objected on the ground that it would be prejudiced by the dismissal, but it did not ask for a continuance. Without doubt Kroger lost an expected ally to its third-party action against Evans and his companies, but, in our view, Kroger had no standing to object to the dismissal of an action to which it was not a party. Cf. Young v. Wilky Carrier Corporation, 150 F.2d 764 (3d Cir. 1945). Indeed, if plaintiffs discovered prior to trial that they could not prove their case against Evans Manufacturing Company, Incorporated, conceivably they had a duty to request a dismissal.

Kroger excepted to a portion of the charge (R., p. 1583) as follows:

"* * * If I understood the Court's charge correctly, the Court has told this jury, late in the charge that if the Kroger Company could anticipate that a boy would play with fire, if they could foresee that, then they can be liable.

"And, I think that is what Your Honor is doing, quite unintentionally, is in that portion of the charge eliminating 402(a) and imposing on the seller of clothing for children the duty that the parents obviously have to undertake."

Presumably the exception was directed to the instructions appearing in the Record at pages 1561–1562.

Section 402A, comment h, states that "a product is not in a defective condition when it is safe for normal handling and

---

18. Judgment n. o. v. should be denied where evidence is conflicting. Stanek v. Cole, 178 F.2d 122 (7th Cir. 1949); 88 C.J.S. Trial § 259 e, p. 710.

19. R., pp. 5–6, followed by a written nunc pro tunc order filed April 27, 1967.

consumption." Thus, a pertinent question of fact is suggested for jury determination. Was the jacket safe for normal handling and consumption? If the question is answered negatively, liability might be imposed upon the seller of the jacket. If answered affirmatively, Kroger is insulated from liability. Likewise, Kroger would not be liable if the jury found that the harm was caused by extraordinary or abnormal use.

■ The assailed instructions, in relating the evidence to the law plainly told the jury to find in favor of Kroger if they found the jacket was safe for normal wear by young children; but if they found it was in a defective condition unreasonably dangerous for normal use or wear by a five-year-old child, and that Kroger by its officers and employees could reasonably have anticipated or foreseen that exposure to fire might occur during normal wear by such a child, they might find Kroger liable. The instructions emphasized that if the jury found that conduct of such children playing with fire was so extraordinary or abnormal, they might find that Kroger could not have anticipated or have foreseen the harm, and they should exonerate Kroger from liability; but if they found such conduct on the part of young children could reasonably have been foreseen by Kroger, and such conduct was not abnormal or extraordinary, they might find Kroger liable.[20] As Kroger argues, foreseeability is a standard used to determine fault, but in our opinion it is also an important factor in determining the applicability of § 402A. See: Noel, supra, 71 Yale L.J. at pp. 855–866. If foreseeability is not a factor applicable to § 402A, then perhaps the instructions were more favorable to Kroger than it had a right to expect.

We think the charge as a whole adequately posed the essential issues of fact for the jury to decide and related them to the law of strict liability.

*Motion for New Trial in Third-Party Action*

In the third-party action the trial was limited to the parentage of the LaGorga jacket. Rule 42(b), Fed.R.Civ.P.

■ It is our opinion that the weight of the evidence justified the finding that the third-party defendants, Sidney H. Evans and his companies, did not manufacture the LaGorga jacket.

Evans admitted that Kroger had purchased a large supply of children's jackets from him in the fall of 1962. It was established that there was *one delivery* of the Evans' jackets to the McKeesport Store No. 193, where Mrs. Lettieri, Kroger's chief cashier at that store. saw them on display. She testified that two or three weeks after the Evans' jackets had been sold out, a second lot of jackets was delivered to the McKeesport store. . The second lot was displayed on a table and from this display, she bought three boys' jackets, one of which was given to the minor plaintiff; the second (Exhibit 3) was given to Mrs. Grego; the third, also given away, was not recovered. Her testimony was undisputed. The supplier of the second lot of jackets was not revealed.

A boy's jacket (Exhibit 4) was purchased by Mrs. Basa in the spring of 1963 at Kroger's store known as Great Valley Shopping Center. This was the jacket tested by Dr. Beroes, the plaintiffs' expert, because it was unwashed. There was compelling evidence tending to show that these jackets (Exs. 3 and 4), and, inferentially, the LaGorga jacket, differed in several material respects from jackets manufactured by Evans and sold to Krogers. There was also evidence that Exhibit 3 and its companion, the LaGorga jacket, were not made by the manufac-

20. Cf. Hardman v. Helene Curtis Industries, Inc., 48 Ill.App.2d 42, 198 N.E.2d 681, 12 A.L.R.3d 1033 (1964); Spruill v. Boyle-Midway, Incorporated, 308 F.2d 79, 83–85 (4th Cir. 1962); Hubbard-Hall Chemical Company v. Silverman, 340 F.2d 402 (1st Cir. 1965). It is to be noted that the products in these cases were perfectly manufactured and liability is expressed in terms of warranty and negligence.

turer of Exhibit 4 (R., pp. 1323, 1326–1327; see also, Dr. Beroes' testimony at pp. 881–890). If this evidence was given credence, the burning characteristics of Exhibit 3 and the LaGorga jacket were not necessarily the same as those of the tested jacket (Ex. 4).

Kroger advances six reasons for a new trial.

■■■ It complains that the "Court erred in permitting the Third-party Defendants [Evans] to abandon the position they had taken throughout the pretrial procedures, and until the opening of this trial, that, if minor plaintiff was wearing a hooded jacket purchased at Kroger's, said jacket had been supplied to Kroger's by Sidney Evans doing business as Evans Manufacturing Company." Surely Kroger is mistaken.

The Answer to Kroger's Third-Party Complaint effectively denied the averment that the jacket involved was purchased from and manufactured by Evans and his companies. It stated that Evans "has no knowledge as to whether or not the jacket" involved had been supplied to Kroger by him.[21] Rule 8(d), Fed.R. Civ.P.

Thus, we think it was not error to strike from the evidence (R., p. 1236) "the undenied allegations of paragraph three of the Third-Party Complaint", which at Kroger's instance (R., p. 1231), the court had admitted in evidence as an admission (R., p. 1233). It will be noted that the last sentence of paragraph 2 of the Answer was subsequently admitted in evidence without objection (R., pp. 1241–1242).

Evans, having denied the parentage of the LaGorga jacket in his Answer, was not required to deny it again. Thus, when Kroger succeeded in having paragraph 6 of the Amendment to Third-Party Complaint,[22] which in substance was the same as paragraph 3 of the original,[23] admitted in evidence *because undenied* (R., p. 1239), we think it was not error subsequently to strike it from the evidence (R., p. 1522).

It is possible that Kroger's trial counsel was misled by the pleadings in the third-party action (Kroger's pleadings were prepared by former counsel) and believed that if it was established that the LaGorga jacket was purchased at Kroger's store there was no issue of parentage. But the Pretrial Stipulation, executed by Kroger's trial counsel, should have emphatically dispelled such misapprehension. This Pretrial Stipulation filed by the parties over seven months prior to trial states that one of the issues of fact to be litigated is the parentage of the

21. Paragraph 3 of Kroger's Third-Party Complaint states:
"3. Certain jackets identical to the one alleged by the plaintiffs to have been purchased from The Kroger Co. were purchased from and manufactured by Evans Manufacturing Co., also known as Evans Manufacturing Company, Incorporated, and as Sidney H. Evans, individually and trading and doing business as Evans Manufacturing Co."
Paragraph 2 of Evans' Answer to the Third-Party Complaint states:
"2. Paragraph three of the Third-party Complaint is denied as stated. Specifically, it is denied that the defendant purchased the jackets from EVANS MANUFACTURING COMPANY, INC. and/or that said corporation manufactured any jackets. It is admitted that SIDNEY H. EVANS, trading and doing business as EVANS MANUFACTURING

COMPANY, sold certain jackets to the defendant but this Third-party defendant has no knowledge as to whether or not the jacket allegedly worn by the minor-plaintiff had been supplied to the defendant by this Third-party defendant."

22. Paragraph 6 of Kroger's Amendment to Third-Party Complaint states:
"6. If it is established at the trial that the jacket involved was sold by The Kroger Co. and reached the minor plaintiff and was worn by the minor plaintiff without substantial change from the condition in which it was sold, then said jacket was manufactured by and was purchased from Evans Manufacturing Co., also known as Evans Manufacturing Company, Incorporated, or as Sidney H. Evans, individually and trading and doing business as Evans Manufacturing Co."

23. See f. n. 21, supra.

LaGorga jacket.[24] In addition, at the pretrial conference held almost four months before the trial when the pretrial judge hopefully believed that it might be stipulated that the LaGorga jacket was manufactured by Evans, the following colloquy took place (Tr. of Pretrial Conference of December 19, 1966, p. 11):

"THE COURT: It is stipulated that Mr. Evans, trading and doing business as Evans Manufacturing Company, manufactured the jacket involved in this case.

"MR. EDGECOMBE: *This is not correct, Your Honor.*

"THE COURT: Well, strike that out then, and we will bring it up at trial. I thought that is what you wanted from the beginning.

"MR. EDGECOMBE: I wanted to agree—and said in the beginning—that Evans doing business as Evans Manufacturing Company manufactured jackets of a kind similar to that described by the plaintiff. We have never stipulated that this precise jacket was manufactured by him.

"THE COURT: All right. Strike all that out.

"MR. EDGECOMBE: I think that is Mr. Martin's position with respect to the sale of the jacket.

"THE COURT: Okay.

24. Pretrial Stipulation filed September 8, 1966, inter alia, states:
"V. The following issues of fact remain to be litigated upon the trial:
" * * *
"4. Whether minor plaintiff was wearing a jacket which was manufactured and sold by Sidney H. Evans or Evans Manufacturing Company, Incorporated, or either of [sic] both of them."
"III. The following facts are stipulated by the parties and require no proof:
" * * *
"3. A jacket was presented to minor plaintiff as a gift from Mrs. Lettieri prior to April 26, 1963."
"III. (a) Any reservations as to the foregoing stipulated facts are as follows:
" * * *

"MR. EDGECOMBE: If I am wrong, maybe *he should say so.*" (Emphasis supplied.)

No contrary position appears to have been expressed by Mr. Martin (Kroger's trial counsel) on the record of the conference.

It is our opinion that the parentage of the LaGorga jacket was a disputed issue of fact clearly revealed by the pretrial proceedings which constituted the pretrial order in the case. A pretrial order supplements the pleadings and controls the course of the trial. Rule 16, Fed.R.Civ.P. Basista v. Weir, 340 F.2d 74, 85 (3d Cir. 1965).

Finally, Kroger complains that the court erred in refusing to admit in evidence Exhibit K-J, a charcoal-colored jacket which its counsel brought to court during his lengthy cross-examination of Mr. Evans near the end of the trial (R., pp. 1406–1407). This exhibit was offered as part of Kroger's proof that the LaGorga jacket was manufactured by Evans (R., pp. 1408–1409). It was part of Kroger's case in chief in which it had the burden of proving that Evans manufactured and supplied the LaGorga jacket. It was not offered to impeach Mr. Evans, nor to test his competency as an expert. Opposing counsel objected to its admission on the grounds that it was not "authenticated" or identified by any witness, its source was not identified, and it was not exhibited at pretrial.

"2. Counsel for Evans Manufacturing Company, Incorporated, demands proof that the jacket was manufactured by Evans Manufacturing Company, Incorporated.
" * * *
"4. Sidney H. Evans has no knowledge whether the jacket allegedly worn by the minor plaintiff had been supplied by him to The Kroger Company."
On page 6 of the Pretrial Stipulation the following note appears:
"NOTE: The following statements assume that the jacket in question was manufactured by either Sidney H. Evans or Evans Manufacturing Company, Incorporated, or both, *the fact as to whether it was supplied by either or both being an issue in the case*". (Emphasis supplied.)

The Order of Court Fixing Pretrial Procedure required the litigants to mark and list their exhibits and present such a list at the pretrial conference. It also required each party to comply strictly with Local Rule 5–II–C–5(b), which Rule, inter alia, requires that prior to pretrial conference all exhibits shall be made available to opposing counsel for *inspection*. The proposed Exhibit K-J had not been marked, listed, or shown to opposing counsel prior to trial. To introduce an undisclosed exhibit near the end of the trial carries with it the element of surprise and, ordinarily, such exhibit is not admitted in evidence over objection. We think the ruling was proper.[25] *Valdesa Compania Naviera, S. A. v. Frota Nacional de Petroleiros,* 348 F.2d 33, 36–38 (3d Cir. 1965).

An appropriate order will be entered.

25. Strangely enough Kroger did not exhibit to Mr. Evans at his deposition taken on August 11, 1965, the several jackets it had in its possession, i. e., Exhibits KA, KG and KJ, nor did it inquire of Mr. Evans whether he supplied any of them to Kroger.