**Jane BRECH, Plaintiff,**

**v.**

**J. C. PENNEY COMPANY, INC., Defendant.**

**CIV 79–4065.**

United States District Court, D. South Dakota, S. D.

Feb. 24, 1982.

---

David V. Vrooman, Sioux Falls, S. D., and John P. Blackburn, Yankton, S. D., appeared in behalf of plaintiff.

Steven M. Johnson of Brady, Kabeiseman, Reade, Abbott & Johnson, Yankton, S. D., appeared in behalf of defendant.

## MEMORANDUM DECISION

NICHOL, Senior District Judge.

This is a products liability diversity action brought by Jane Brech (Jane or Brech) against the defendant, J. C. Penney Company, Inc. (Penneys) to recover damages for injuries she received when the nightgown she was wearing caught fire. Brech is seeking one million dollars in compensatory damages. Brech's complaint sets forth two counts, both founded in strict liability in tort. In the first count Brech alleges that the non-flame resistant gown was unrea-

sonably dangerous when worn around a gas stove and that the unsafe nature of the gown was the proximate cause of Jane's injuries. In the second count Brech alleges that Penney's failure to warn of the unreasonably dangerous nature of the non-flame resistant fabric was the proximate cause of Jane's injuries. The action was tried to the Court.

Jane Brech received second and third degree burns to approximately forty percent of her body [1] on January 9, 1978, when the cotton flannel nightgown she was wearing caught fire while she was fixing oatmeal on the gas stove in her home. Jane was seventeen at the time of the accident, and a sophomore in high school. Jane lived with her father, Frederick Brech, and her brother, Richard Brech. Both Richard and Frederick were attending a funeral out of town at the time of the accident. Jane's mother had been hospitalized for approximately one year prior to the accident, and consequently Jane did most of the cooking for the family.

Richard Brech, age 32, testified that he purchased two identical, long cotton flannel nightgowns in December of 1976 from Penneys, as Christmas gifts. One gown, an extra-large, was purchased for Leola Manning, a neighbor. The second gown, a small, was purchased for Richard's mother. Richard further testified that the gowns were on display in the women's department at Penneys and that his only considerations in selecting the gifts were size and price.

Jane testified that on January 9, 1978, she was wearing the nightgown originally purchased for her mother. Jane testified that she found the gown in her mother's dresser drawer, that she had worn the gown once or twice before and that she thought it had been washed once or twice. Frederick Brech, however, did most of the laundry and he testified that he did not remember Jane ever wearing the gown, or ever washing the gown.[2]

Jane got up at about 9:15 on January 9; she put on blue jeans and tucked the nightgown into the jeans. Jane was watching T.V. in the living room when she decided to make some breakfast. She lit the gas stove and began boiling water for oatmeal. Jane testified that she was moving back and forth from the living room to the kitchen so that she could continue to watch T.V. while she was making breakfast.

While Jane was pouring the oatmeal into the boiling water, she smelled smoke and then she noticed that the left sleeve of the gown was on fire. She patted this flame out with a hand towel. She then noticed flames on the front of the gown and around the top of her jeans. Jane laid down and rolled on the floor attempting to extinguish the fire. When rolling on the floor did not put out the fire, Jane ran to the bathroom and jumped into the shower. Jane then called the emergency number (911) and requested assistance.

---

1. Jane received third degree burns to approximately 31% of her body and second degree burns to approximately 8½% of her body. The full thickness injury, or third degree burns, involved the anterior trunk, 10% total body surface, posterior trunk, 10%, right arm, 2%, left arm, 5%, right leg, 1½%, and left leg, 3½%.
   Third degree represents injury as the result of heat from fire which destroys the entire thickness of the skin and requires skin grafting. Second degree destroys only the upper layers of the skin; this will blister and then heal on its own. (Depos. Bruce MacMillan, M.D., p. 7–8).

2. There is some conflict in the testimony as to whether the gown Jane was wearing was the same gown purchased from Penneys thirteen months earlier. In answers to interrogatories it was indicated that the gown purchased for Mrs. Brech was an extra-large. At trial both Jane and Richard testified that the gown was a small; however, Jane also testified that she had not read the label prior to the accident. Jane further testified that she had worn the gown once or twice and that it had been laundered once or twice. Dr. Golub, however, testified that the unburned remnant that he tested had been laundered at least fifty times. Although Jane testified that the only time she examined the label on the nightgown was after the fire, the label was not introduced at trial to verify that the gown was purchased at Penneys. Since this fact will not alter the decision of the Court, the Court will assume that the gown Jane was wearing was the same gown purchased from Penneys by Richard Brech for his mother.

The fire department and an ambulance responded to the emergency call. Jane was taken by ambulance to the local hospital in Yankton and nine days later transferred to the Shrine Burn Institute in Cincinnati, Ohio, for treatment.

The Brech's home was heated by a natural gas space heater in the living room. The safety glass covering the pilot light on the space heater was broken and had been removed. The Brechs also would light the gas oven in the kitchen and leave the oven door open for additional heat on cold days. There is conflicting testimony as to whether the oven was being used as a source of heat on the day of the accident. Jane, however, had stayed home from school on January 9 because it was twenty degrees below zero and too cold to walk the mile to school. It is therefore quite probable that the oven was used that day to help heat the house.

Dr. Samuel Golub,[3] as an expert witness for Penneys, testified that all fabrics will burn given a heat source. Dr. Golub conducted flammability tests on an unburned remnant of Jane's gown, on a Penneys gown similar to the one worn by Jane, and also on the identical gown purchased for Mrs. Manning. All three gowns not only met the federal flammability standards as "Class 1—normal flammability", but exceeded these four times over.[4] Dr. Golub testified that the cotton flannel used in these gowns would be suitable even for children's sleepwear, where the flammability standards are much more stringent.

Considering the nature and extent of the burns suffered to the legs and the body, and the fact that fire burns upward, it was Dr. Golub's expert opinion that Jane's injuries did not result simply from the sleeve of the gown catching fire over the gas stove. Rather, it is Dr. Golub's conviction that there were two ignition sources; the first in the right leg of the pants and the second in the left sleeve of the gown. This would account for the fact that Jane first smelled smoke from the smoldering pants and then noticed the fire on the sleeve. Although she patted out the fire on the sleeve, the pants continued to burn upward until the gown caught fire. By this time the fire had created an intense heat source and the flames spread rapidly. Apparently the fire in the jeans started either from the oven or the space heater.

The plaintiff contends that Penneys knew or should have known that the non-flame resistant gown was unreasonably dangerous when worn around a gas stove and that

3. Dr. Golub is Assistant Director of Albany International Research Co., an independent research laboratory. Dr. Golub is in charge of flammability testing and has conducted research in this area for thirty years.

4. 15 U.S.C. section 1191 et seq. authorizes the Consumer Product Safety Commission to issue standards of flammability. The regulations adopted by the Commission are set forth in 16 C.F.R. section 1602.1 et seq. (1977). Dr. Golub conducted tests in accordance with the requirements of 16 C.F.R. section 1610.4 (1977). Under the regulations for Class 1, normal flammability (the highest standard), the time to ignite the fabric must be at least one second and the time of flame spread must be at least 3.5 seconds.

Dr. Golub testified that the test results on Mrs. Manning's gown was two seconds for ignition and 17.6 seconds for flame spread. This is five times the requirement set by federal regulation. Dr. Golub testified that this gown would be suitable for children's sleepwear, where the requirements are much more stringent.

The test results on Jane's gown indicated three seconds for ignition and fourteen seconds for flame spread. Dr. Golub explained that the difference in the test results was due to the fact that Jane's gown had been washed more times than Mrs. Manning's gown. Dr. Golub further testified that a flame resistant gown would react in the same way, as material loses its flame resistant properties with repeated washings.

The similar gown obtained from Penneys for purposes of testing showed a three second ignition time and a flame spread time of 13.1 seconds.

The National Fire Protection Association has attempted "to reduce danger of injury and loss of life by providing standard methods for testing and classifying the flammability of textile and other products for clothing use." (NFPA No. 702–3, 1968). Under the standards set by the National Fire Protection Association, all three garments tested by Dr. Golub would be classified as "normal flammability" and would be "generally accepted as having no unusual burning characteristics." (NFPA No. 702–5, 1968).

Penneys is strictly liable in tort for placing an unreasonably dangerous product on the market, a product that was not safe for its intended use.

■ The South Dakota Supreme Court adopted the doctrine of strict liability in tort in *Engberg v. Ford Motor Co.*, 87 S.D. 196, 205 N.W.2d 104 (1973). In order to recover under the theory of strict liability, the plaintiff has the burden of proving that the product was sold in a defective condition, rendering it unreasonably dangerous to the user or consumer, and that the defective product caused the injuries suffered. Restatement (Second) of · Torts, section 402A. "A product is deemed defective when it is not reasonably fit for the purpose for which it was intended to be used." *Engberg v. Ford Motor Co.*, 87 S.D. 196, 205 N.W.2d 104, 107 (1973). An article is not dangerous as to its known properties, but only as to characteristics that would not be contemplated by the ordinary consumer purchasing the article. Restatement (Second) of Torts, section 402A, comment i. Nor is a product defective when it is safe for normal handling and consumption. Restatement (Second) of Torts, section 402A, comment h. "The defective condition must be such as to make the product unreasonably dangerous: dangerous to the extent that any product so designed would not be placed in the channels of commerce by a prudent manufacturer aware of the risks involved in its use, or dangerous to the extent that the product so manufactured would not meet the reasonable expectations of the ordinary consumer as to safety." *Simien v. S. S. Kresge Co.*, 566 F.2d 551, 557 (5th Cir. 1978). *Community Television Services, Inc. v. Dresser Industries, Inc.*, 435 F.Supp. 214, 216, *aff'd* 586 F.2d 637, *cert. denied* 441 U.S. 932, 99 S.Ct. 2052, 60 L.Ed.2d 660 (1977). The seller is not an insurer, and injury alone will not create liability. *Simien v. S. S. Kresge Co.*, 566 F.2d 551, 557 (5th Cir. 1978); *Schneider v. Chrysler Motors Corp.*, 401 F.2d 549, 557 (8th Cir. 1968).

■ The Court must apply the facts outlined above to these principles of law to determine whether there was some defective design that rendered the nightgown unreasonably dangerous to Brech. The plaintiff alleges that the nightgown was dangerously inflammable when worn around a gas stove and this fact alone constitutes a known defect.

The nightgown fabric not only met, but far exceeded the requirements for normal flammability under the Flammable Fabrics Act, 15 U.S.C. section 1191 et seq. (1976), and Commercial Standard 191–53.[5] Dr. Golub found the nightgown in question and the duplicàte gown to be four times safer and slower burning than the government regulations require. See footnote 4 *supra.* The purpose of the CS 191–53 test is to set a reasonable standard so that a fire once started on a garment can be extinguished within a reasonable time. Although all fabric will burn given a proper heat source, the purpose of the test is to remove from the marketplace unreasonably dangerous fabrics in terms of flammability. The test results indicated and Dr. Golub testified that Jane was actually safer in the nightgown in question than she would have been wearing many other garments, including the average shirt, blouse or dress. A film shown to the Court revealed that all fabric will burn over a gas flame, even steel wool and flame-resistant fabric. The film showed that over a gas flame, flame-resistant fabric burns as fast or even faster than nonflame-resistant fabric. (Defendant's Exhibit H). Dr. Golub testified that the nightgown in question is safer than seventy-five percent of all fabric now manufactured and distributed in the United States.

The testimony that the fabric far exceeded the minimum federal requirements is substantial evidence that the nightgown was not unreasonably dangerous. *Simien v. S. S. Kresge Co.*, 566 F.2d 551, 554 (5th Cir. 1978). Compliance with the standard, although relevant, is not conclusive evidence, however, that the garment was not defective or unreasonably dangerous. *Howard v.*

---

**5.** Commercial Standard 191–53 is set forth in 16 C.F.R. section 1610.3 (1977).

*McCrory Corp.*, 601 F.2d 133, 138 (4th Cir. 1979). *See Raymond v. Riegel Textile Corp.*, 484 F.2d 1025, 1027 (1st Cir. 1973); *LaGorga v. Kroger Co.*, 275 F.Supp. 373, 378 (W.D.Pa.1967), *aff'd* 407 F.2d 671 (3rd Cir. 1969); *Gryc v. Dayton-Hudson Corp.*, 297 N.W.2d 727, 734 (Minn.), *cert. denied* 449 U.S. 921, 101 S.Ct. 320, 66 L.Ed.2d 149 (1980).[6]

The plaintiff must produce substantial expert or lay evidence that a fabric which complies with the federal standard is nevertheless unreasonably dangerous for normal use. *Simien v. S. S. Kresge Co.*, 566 F.2d 551, 558 (5th Cir. 1978). *See LaGorga v. Kroger Co.*, 275 F.Supp. 373 (W.D.Pa.1967), *aff'd* 407 F.2d 671 (3rd Cir. 1969); *Carter v. Joseph Bancroft & Sons Co.*, 360 F.Supp. 1103 (E.D.Pa.1973); *Jahnig v. Coisman*, 283 N.W.2d 557 (S.D.1979). The plaintiff, however, offered neither expert nor lay testimony as to the unreasonably dangerous nature of this gown or the unusual burning characteristics of the gown. This leaves the Court with uncontroverted evidence that this nightgown was made of fabric classified as "normal flammability"; that in comparison to other materials generally used in clothing, the nightgown was safer than most other materials; and in fact the nightgown would meet and even surpass the more stringent requirements for children's clothing. The plaintiff did not introduce one shred of evidence that would support even an inference that the nightgown was defective or unreasonably dangerous. The plaintiff attempts to persuade the Court that the very fact that Jane Brech suffered severe burns to forty percent of her body makes the gown ipso facto defective. This indeed is not sufficient to impose liability on Penneys as the seller of the garment.

"The doctrine of strict liability was not intended to make sellers absolute insurers for all physical harm which occurs during use of the product." *Simien v. S. S. Kresge Co.*, 566 F.2d 551, 559 (5th Cir. 1978); *Helene Curtis Industries, Inc. v. Pruitt*, 385 F.2d 841, 864 (5th Cir. 1967); *Engberg v. Ford Motor Co.*, 87 S.D. 196, 205 N.W.2d 104, 109 (1973). Liability depends on substantial evidence that the product is unreasonably dangerous for its intended use. Brech has failed to introduce such evidence.

■ In the second count of the complaint the plaintiff alleges that Penneys knew or should have known that non-flame resistant fabric is unreasonably dangerous, that Penneys' failure to warn the consumer about the flammable characteristics of the non-flame resistant gowns rendered the gown worn by Jane Brech unreasonably dangerous and that Penneys is strictly liable in tort for its failure to warn.

Brech introduced Penneys 1976 Christmas catalog to establish that the same nightgowns purchased by Richard Brech were offered for sale in the catalog. The catalog, however, offered the gowns in both flame resistant and non-flame resistant fabric. Brech argues that Penneys recognized the benefits and the added safety inherent in the flame resistant gowns and therefore had a duty to warn customers shopping in its retail outlets that the gowns on display were not flame resistant and that flame resistant gowns could be purchased through the catalog.

Penneys admitted that they offered flame resistant sleepwear for adults in the 1976 Christmas catalog, but went on to explain that they were market testing the FR treated gowns through catalog circulation. Penneys found that people were not willing to pay the higher price for FR treated adult sleepwear and therefore no longer sell those garments, even in the catalog. Penneys further admits that there were no warnings as to the flammability of the nightgown on the garment itself. Nor

---

**6.** In each of these cases the garment, although in compliance with the federal regulations, displayed unusual burning characteristics. In each case an eye witness testified as to the rapidness with which the fire engulfed the person, the intensity of the fire, and the difficulty in extinguishing the fire. In this case, the only lay testimony as to the fire was that of the plaintiff, and Jane indicated that she was able to put out the fire within five minutes. Although the Court doubts that Jane was actually on fire for five minutes, there is absolutely no other testimony regarding the fire.

were there warnings in the store as to the flammable characteristics of the nightgown, or that the nightgown may be unreasonably dangerous if worn around a gas stove or near an open flame. Penneys argues that it did not have a duty to warn as to a known and obvious danger.

Dr. Golub testified that the Consumer Products Safety Commission has conducted in depth studies and investigations as to the feasibility and need under the Flammable Fabrics Act to warn the consumer as to the flammability of a particular garment. The Consumer Products Safety Commission, however, has never suggested that the manufacturer has a duty to warn consumers that a particular item of clothing is flammable.

In *Jahnig v. Coisman*, 283 N.W.2d 557 (1979), the South Dakota Supreme Court stated: "(T)he product itself need not be defective. Where a manufacturer or seller has reason to anticipate that danger may result from a particular use of his product, and he fails to give adequate warning of such a danger, the product sold without such warning is in a defective condition within the strict liability doctrine." *Id.* at 560. *See also Degen v. Bayman*, 90 S.D. 400, 241 N.W.2d 703, 708 (S.D.1976); Restatement (Second) of Torts, section 402A, comment h.

Penneys argues that it is common knowledge that fabric when exposed to an open flame will burn, the nightgown itself was not unreasonably dangerous, and therefore it had no duty to warn the consumer that exposure of the nightgown to an open flame may create an unreasonable danger. This position finds support in the Restatement of Torts. The Restatement defines "unreasonably dangerous" as follows: "The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Restatement (Second) of Torts, section 402A, comment i. Where the seller has reason to anticipate that danger may result

from a particular use of the product, there may be a duty to warn of such danger. Restatement (Second) of Torts, section 402A, comment h. The seller, however, is not required to warn about a danger, or the potentiality of danger, if such danger is generally known and recognized. Restatement (Second) of Torts, section 402A, comment j.

Between 1969 and 1976 there were eleven actions filed against Penneys for injuries women received while wearing one hundred percent cotton flannel nightgowns. (Plaintiff's Exhibit No. 95). Brech argues that based on this information, Penneys knew or should have known of the potential danger, and thus they had a duty to warn the consumer of such dangers. The Court is not persuaded by these statistics. Surely out of the thousands of gowns sold each year the fact that over an eight year period eleven gowns were involved in a fire is not significant, especially when the circumstances surrounding the cause of the fire and the nature of the fire itself are unknown.

Brech's reliance on the South Dakota cases holding that there is a duty to warn is misplaced, as these cases are easily distinguishable. Each case involved a latent danger, a danger that would not be understood or anticipated by the average consumer absent such a warning. *See Jahnig v. Coisman*, 283 N.W.2d 557 (S.D.1979) (failure to warn that improperly vented wall furnace may cause carbon monoxide poisoning); *Degen v. Bayman*, 90 S.D. 400, 241 N.W.2d 703 (S.D.1976) (failure to warn that boat would start in gear); *Yarrow v. Sterling Drug, Inc.*, 263 F.Supp. 159 (D.S.D.1967), *aff'd* 408 F.2d 978 (8th Cir. 1969) (failure to warn of side effects caused by drug). The South Dakota Supreme Court has never applied the failure to warn doctrine to an open and obvious danger.

Implicit in the duty to warn is the requirement that the consumer would be ignorant of the danger involved absent such a warning.[7] "Thus, it is generally held that

7. The Restatement acknowledges this require-

ment in comment j to 402A: "In order to pre-

there is no duty to warn when the danger or potentiality of danger is obvious or is actually known to the injured person." *Hagans v. Oliver Machinery Co.*, 576 F.2d 97, 102 (5th Cir. 1978).

Brech places great reliance on the case of *Gryc v. Dayton-Hudson Corp.*, 297 N.W.2d 727 (Minn.), *cert. denied* 449 U.S. 921, 101 S.Ct. 320, 66 L.Ed.2d 149 (1980). Such reliance, however, is misplaced as this case, as with most cases cited by the plaintiff, involved a small child. The defendant in *Gryc* was the manufacturer of the pajamas. The research department for the manufacturer had years before the incident indicated in a memorandum that they were "sitting on somewhat of a powder keg as regards our flannelette being so inflammable." The manufacturer, however, did not make any changes in the fabric even after the memorandum. The plaintiff in *Gryc* utilized expert testimony to establish that the fabric for a small child was dangerous because of the "instantaneous manner of its ignition, the speed at which it burned, the amount of heat produced when burned, and difficulty of extinguishing the flames." *Id.* at 730.

Brech, however, has failed to introduce any evidence as to the unusual burning characteristics of the gown. In fact, according to Brech's own testimony, she was easily able to pat out the flame on the sleeve with a small towel. This would indicate that there were no unusual burning characteristics associated with the gown she was wearing.

To require a warning that the nightgown would burn if exposed to an open flame would require that all clothing would carry such a warning. Such a warning is obviously not within the meaning and spirit of strict liability. "(A) seller is not required to warn with respect to products, . . . when the danger, or potentiality of danger is generally known and recognized." Restatement (Second) of Torts, section 402A, com-

ment j. *See Hagans v. Oliver Machinery Co.*, 576 F.2d 97, 102 (5th Cir. 1978).

Brech has failed to persuade the Court that Penneys had a duty to warn about the flammable characteristics of the nightgown, or that the nightgown could become unreasonably dangerous when worn around an open flame.

Accordingly, the Court finds for the defendant, J. C. Penney Company, Inc., on both counts.

The foregoing memorandum decision constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure. Counsel for the defendant, J. C. Penney Company, Inc., may prepare an appropriate judgment.

vent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use. The seller may reasonably assume that those with common allergies, as for example to eggs or strawberries, *will be aware of them, and he is not required to warn against them.*" (Emphasis added).