**FRANK R. JELLEFF, Inc.,**
Appellant,

v.

**Blanche K. BRADEN, Appellee.**

No. 12768.

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 7, 1955.

Decided April 20, 1956.

Mr. Paul R. Connolly, Washington, D. C., with whom Mr. Francis L. Casey, Jr., Washington, D. C., was on the brief, for appellant.

Mr. Joseph S. McCarthy, Washington, D. C., with whom Mr. Wilbert McInerney, Washington, D. C., was on the brief, for appellee.

Before PRETTYMAN, BAZELON and DANAHER, Circuit Judges.

DANAHER, Circuit Judge.

This appeal follows a judgment entered pursuant to a jury verdict for $65,000 damages against a retail dealer in women's clothing. The action was based upon an alleged breach of warranty of fitness.[1] The appellee on January 6, 1952, had purchased a finger-tip or hip length "brunch" coat or smock from the appellant. She wore the garment only two or three times since it bore a "metallic" odor which she found "objectionable." On March 6, 1952, she had remained home due to a minor illness and while preparing a meal, the smock came in contact with the outer ring or rings of the burner on her electric stove. The smock was buttoned down the front but hung in a flaring fashion. The jury could have found that the garment was in a vertical position above the burner when it became ignited while appellee was reaching for a can of sugar on a shelf above the stove. She first noticed the smock was afire when the flames reached her chest. The jury could have found that "it would take somewhere between 1 and 2 seconds, maybe more" for appellee, standing before the stove, to reach to the shelf above. Whatever the exact time for the fabric to become ignited and thereafter to burn some ten or twelve inches to where flames were first noticed was not shown. The jury could have found that a fabric in a vertical position burns three times as rapidly as the same fabric at an angle of forty-five degrees. The jury could have found that a fabric which is preheated will ignite more rapidly than one which has not been so "conditioned."

Apparently, the garment here in question was multicolored, with an overlay of gold, probably a bronze metallic pigment. The metallic pigment when heated could have the effect of drying the fabric by dispersing heat, taking it up faster than the textile part of the material, thus achieving a more widespread dryness than otherwise might be found. The flames spread rapidly throughout the right half of the garment, front and back, and the right sleeve, and as appellee ran from the kitchen to her bathtub, various charred portions of the garment fell to the floor and burned several spots into the rug. At the tub, the left portion of the garment fell into the tub and was later thrown out by the janitor. The flaming garment not only burned appellee severely, in places causing third degree burns, but it melted or fused a buckle and the strap on the woman's nylon brassiere and burned the imprint of the strap into her back. "It went up so fast that I couldn't get the canister down in time to bring down my arm to protect myself," appellee testified. Various witnesses upon entering the apartment after the fire discerned a strong burned metallic odor which they described to the jury. One witness picked up and saved a few of the charred fragments of the burned garment, from one of which a pattern could be perceived with the outline of the gold or bronze metallic overlay still visible.

After the first trial, the jury disagreed. While a second trial, which re-

---

1. D.C.Code 1951, § 28–1115(1) provides:
   "Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment * * * there is an implied warranty that the goods shall be reasonably fit for such purpose."

sulted in disagreement, was in progress, appellant's counsel became fearful that the statute of limitations might bar an indemnity suit against the manufacturer. He caused his partner to call up attorneys in Indiana and ask that a suit be filed in the United States District Court for the Northern District of Indiana in which the present appellant was the plaintiff and the manufacturers of the garment were named as defendants. The complaint alleged that the Indiana defendants had manufactured and sold to the appellant Jelleff a quantity of garments which had been warranted as properly manufactured, of suitable materials, of merchantable quality, "not flammable, and that said smocks would be safe to be worn by the plaintiff's customers." The Indiana complaint further set up that Blanche K. Braden, while wearing a smock of defendant's manufacture, had suffered severe burns, had instituted suit against this appellant, that because of the first trial and the second then in progress, Jelleff had been compelled to expend large sums of money in the preparation and defense of the suit and might further become liable to respond in damages to Blanche K. Braden. The action sought to recover not only the expenses of the litigation but the amount of any judgment which Miss Braden might recover. In particular, the complaint alleged:

"3. Plaintiff further avers that the defendants were guilty of carelessness and negligence in the manufacture of said smocks in this to wit: That said smocks were made and manufactured of flammable materials; that the defendants and each of them knew or in the exercise of ordinary care should have known that said smocks were dangerous and not suitable for wear by the purchaser thereof in that the flammable material of said smocks would in all probability result in injury to the purchasers thereof."

Over Jelleff's objection the Indiana complaint was received in evidence.

At the close of the plaintiff's case Jelleff's motion for directed verdict was denied, but was not later renewed. The defendant called as a witness an officer of the defendant corporation who testified that Jelleff's had made no flammability tests of the garments received from the Indiana manufacturers. He was asked:

"Has Jelleff's had any complaints other than Miss Braden's with respect to the flammability of the fifteen dozen brunch coats that were delivered to the store from Pollock Brothers? A. No, this was the only one."

Thereupon plaintiff's counsel objected and the objection was sustained, but the reply was not stricken and the trial judge gave no instruction to the jury that the answer was to be disregarded. Before an officer of the manufacturing corporation was called as a witness, the plaintiff's counsel in a bench conference informed the judge that in the previous trials the officer had been asked as to the number of similar garments which had been sold and as to how many other complaints had been received. Defense counsel made a proffer to the judge of what testimony he expected to elicit along that line, and the trial judge advised that such testimony would be inadmissible. When the manufacturers' officer was on the witness stand the question was not renewed. The officer testified "We did not run any flammability tests on any of these goods."

We have stated enough of the case to supply background for the three questions raised on appeal. First, the defendant retailer urged that the garment had been made of a "conventional" fabric, extensively used for wearing apparel purposes, and not shown to possess characteristics of combustion different from those which are normal and natural to the fabric *as a type*. Therefore, the retailer could not be liable to a customer for breach of warranty "under the language of this Court in Deffebach v. Lansburgh & Bro., 1945, 80 U.S.App.

D.C. 185, 150 F.2d 591, 168 A.L.R. 1052." * Next, appellant challenged the ruling by which appellant's Indiana complaint against the manufacturers had been admitted "when the complaint was not seen or verified by the retailer and when the circumstances indicated that there was no intention on the part of the retailer to concede the unfitness of the article sold to the customer." The third question raised is "whether the absence of complaints growing out of the sale of a large quantity of garments made *of the same cloth* is a relative circumstance to prove the fitness of one of such garments for normal use." (Emphasis supplied.)

In the Deffebach case, supra, a verdict had been directed for the defendant at the close of the plaintiff's case. Brought under the same statute as the instant action, the District Court's judgment was reversed. There, as here, the purpose of the garment was obvious and was known to the seller. There, as here, the buyer was clearly intended to rely on the seller's judgment that it was fit for use. Miss Braden was alone and had to fight the fire by herself. In Deffebach, as the flames spread through the robe, several persons made immediate and vigorous efforts to extinguish the fire. We said the only "question in the case was whether or not the robe *was* reasonably fit for use as a robe." In resolving that question, we were dealing with the facts in that case. We noted that outer garments intended for domestic wear are not unlikely to come into momentary contact with lighted matches, tobacco, or stoves. It was not simply a question of "instantly" or any other less or more prolonged period of time. Rather, we concluded, if the jury should find the *particular* facts to be as submitted to us, it should have been instructed that a breach of implied warranty of fitness had occurred.

■ Appellant seems to argue that the Deffebach case had established a rule of such rigidity and controlling application that no injured person may recover unless the fire acted "like the Deffebach fire." Not at all; we were saying that the Deffebach facts established a breach, without more. There may still be a question of fact in yet other situations, as here, as Jelleff seemed to realize. Appellant offered the testimony of various experts with reference to the burning rate of various types of "conventional" fabrics. Appellant sought to establish that the destroyed garment was "like" the conventional fabrics, tests as to the burning of which were conducted in the presence of the jury. But the jury could have found that the fabric in the plaintiff's brunch coat was not "conventional," indeed, it could have found the fabric to be very different. Bearing upon the basis for its so finding, without enumerating all facets subject to inferences, were Miss Braden's description of what had happened and how, admissions of the experts as to the igniting and burning rate, the metallic burning odor, the bronze overlay and the degree to which it was consumed, the burning of the carpet, the completeness of destruction of the portion burned, the serious and deep burns of the plaintiff, the melting of the brassiere buckle, all indicating a fierce and sudden fire, and adding up to a jury question which the verdict answered.

■ Having perhaps a quite different effect than appellant supposed were its claims that standards prescribed in the "Flammable Fabrics Act" [2] should have been applied. Perhaps appellant *should* have shown that the garment manufacturer had been governed by its standards. As to this appellee, it should be noted, this occurrence was on March 6, 1952, while the Act was not approved until June 30, 1953, and, by its terms, was not to take effect until June 30, 1954. Indeed, from appellant's experts, the jury, just as we, might conclude that various manufacturers of textiles were

---

* Certiorari denied 1945, 326 U.S. 772, 66 S.Ct. 177, 90 L.Ed. 466.

2. 67 Stat. 111 (1953), 15 U.S.C.A. §§ 1191–1200.

by no means in agreement with what minimum standards should determine flammability, and in any event, the manufacturers were given a year within which to dispose of goods on hand before an attempt at conformity with the Act would be required. The goods here used were manufactured in 1950 and 1951. Neither the Act nor its "standards" applied to this garment.

The ruling by which Jelleff's complaint in the Indiana action was here received in evidence raises an interesting point. Recently we found it unnecessary to decide the question involved.[3] There, after cross examination based upon an earlier complaint, the complaint itself was admitted without objection and we failed to see how the action of the trial judge was inconsistent with substantial justice. In view of the discussions in the briefs then submitted, we could not have been unmindful of the modern trend, although we realized that in times past federal courts quite generally excluded admissions in unverified pleadings.

Indirectly the former rule was noticed in our case of Berry v. Littlefield, Alvord & Co.[4] There the plaintiff sued for injuries received in 1916. During the trial, it developed that the plaintiff had been involved in a 1918 injury for which she also made claim but against a different defendant. The attorney *for the latter* was permitted to testify to admissions made to him by the plaintiff's attorney during the course of negotiations for settlement of the 1918 claim.

There was no proof that her attorney had been authorized by her to make such admissions or that she had any knowledge that they had been made. Reasoning from principles to be discerned from Combs v. Hodge, 1859, 21 How. 397, 404, 62 U.S. 397, 404, 16 L.Ed. 115 and Delaware County v. Diebold Safe Co., 1890, 133 U.S. 473, 487, 10 S.Ct. 399, 33 L.Ed. 674, we, in reversing, said in 54 App. D.C. at page 198, 296 F. at page 288: "Since an admission by an attorney, not expressly authorized, in a formal pleading, is not binding on his client in another case, where the parties are different, it seems that an admission made in an informal talk looking to the settlement of a claim should not be." Appellant now relies upon the cases cited and other such cases, and we have most carefully considered them. We believe they are no longer controlling.

Rule 11, Federal Rules of Civil Procedure, with certain exceptions, does away with the need for verification. Pleadings "shall" be signed by a party's attorney, if he has one, and the signature of an attorney constitutes a certificate by him that he has read the pleading and that to the best of his knowledge there is good ground to support it.[5] Again, in contradistinction to earlier forms, the modern complaint is to be factual in its statement of the basis upon which relief is sought.

The comments of Professor Wigmore will be found pertinent.[6] The courts, latterly, have reflected the modern view.[7] Here Jelleff's Indiana com-

3. Molesworth v. Capital Transit Co., 1954, 94 U.S.App.D.C. 216, 214 F.2d 860.

   Where a plaintiff had claimed certain injuries, we sustained cross examination as to whether she had been in a similar accident and made claim for injuries. Mintz v. Premier Cab Ass'n, 1942, 75 U.S.App.D.C. 389, 127 F.2d 744; taking a similar position, our Municipal Court of Appeals observed: "It is well settled that the pleadings of a party in a prior suit may be introduced into evidence as an admission against her, even though the prior suit involved a stranger to the present action. The basis of this

   rule is that a party should be bound by statements made in formal pleadings, even if they are not sworn to." Watwood v. Credit Bureau, Inc., D.C. Mun.App.1953, 97 A.2d 460, 462.

4. 1924, 54 App.D.C. 195, 198, 296 F. 285, 287–288.

5. Hummel v. Wells Petroleum Co., 7 Cir., 1940, 111 F.2d 883, 886; Russo v. Sofia Bros., D.C.S.D.N.Y.1941, 2 F.R.D. 80.

6. 4 Wigmore, Evidence pp. 53–54, § 1066 (3d ed. 1940); cf. id. §§ 1063–1065.

7. Pennsylvania R. Co. v. City of Girard, 6 Cir., 1954, 210 F.2d 437, 440; Stolte v.

plaint spoke specifically of the very garment involved in the present action. Jelleff's sought to recover from the garment manufacturer because of the very circumstances confronting us. In paragraph 3 of the Indiana complaint, it had been represented by attorneys for Jelleff's that the fabric in the offending garment was flammable, dangerous and not reasonably safe for the purposes for which it was intended. It is true, as Wigmore observes in the discussion referred to, that appellant could have stated its proposition hypothetically. It could have set forth appellant's purpose to seek indemnification only if the liability were fixed against Jelleff's in the Braden case. But it did not do so. Moreover, it purported to ground a claim for past expenses of litigation in any event, as well as for indemnification in the event liability were adversely determined. The complaint had been filed in Indiana on December 3, 1954. The instant action came on for hearing on February 18, 1955. Jelleff's offered as a witness a partner in its firm of attorneys who had authorized the Indiana action in Jelleff's behalf. He explained the circumstances under which the Indiana suit had been authorized, that the action was one of indemnity, that the statute of

limitations in the District of Columbia, is three years,[8] D.C.Code, 1951, § 12–201, and that the Indiana action was a suit for indemnification. Upon cross-examination, the witness testified he had no knowledge as to whether or not an amended pleading had been filed in Indiana which might "delete or in some way change paragraph 3," and at any rate, the attorney who had authorized the suit had given no instructions to Indiana counsel "to file an amended complaint out there deleting paragraph 3." Counsel argued to the jury upon the effect of the Indiana complaint. Judge McGuire in his charge instructed as to evidence in the nature of an admission against interest. He pointed out that Jelleff's had been permitted to explain it.

"So the evidence is in, the explanation of it is in as evidence, and the explanation was that the suit was filed for the reasons already alluded to, and it needs no further explanation on my part except to state again that it is merely a piece of evidence introduced in the case, together with its explanation, and what significance it may have or what weight may be given to it is entirely within your province and within your province alone to deter-

Larkin, 8 Cir., 1940, 110 F.2d 226, 232–233; Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, 2 Cir., 1929, 32 F.2d 195, 198, certiorari denied, 1929, 280 U.S. 579, 50 S.Ct. 32, 74 L.Ed. 629; Tiana Corp. v. Hartley, D.C.S.D.N.Y.1951, 99 F.Supp. 670, 672; Barringer v. Prudential Ins. Co., D.C.E.D.Pa.1945, 62 F. Supp. 286, 287, affirmed, 3 Cir., 1946, 153 F.2d 224; Cf. State Farm Mut. Automobile Ins. Co. v. Porter, 9 Cir., 1950, 186 F.2d 834, 839–840; Proctor & Gamble Defense Corporation v. Bean, 5 Cir., 1945, 146 F.2d 598, 601.

Although in Fuller v. King, 6 Cir., 1953, 204 F.2d 586, 590–591, it was held [taking account of the Michigan rule] that "unsigned, subsequently renunciated, pleadings" had been erroneously admitted, the court recognized as "an accepted rule of evidence that, under certain conditions, statements contained in pleadings in another action, prepared by counsel employed to handle such action, are quasi-admissions, and while not conclusive are

nevertheless admissible in evidence * * *." Here, no evidence was offered by Jelleff's negating its counsel's authority to act, indeed its attorneys were permitted to offer such explanation as was pertinent. The trial judge left to the jury the question of what weight might be given to the pleadings. We need go no farther. Cf. Anderson v. Tway, 6 Cir., 1944, 143 F.2d 95, 100, certiorari denied, 1945, 324 U.S. 861, 65 S.Ct. 865, 89 L.Ed. 1418. The Sixth Circuit in Louisville & N. R. Co. v. Tucker, 1954, 211 F.2d 325, 334, read Fuller v. King, supra, as holding that pleadings "later withdrawn" are not admissible.

8. At this point, the jury was told: "The Court: The statute of limitation, for the benefit of the jury, is a period of time during which suit must be brought. If the period of time lapses, whether six years or three years, you may bring no suit." See New Amsterdam Casualty Co. v. Baker, D.C.Md.1947, 74 F.Supp. 809.

mine. It is neither controlling nor determinative."

The allegation in the complaint did not prove that the garment was flammable but it certainly was evidence that Jelleff's claimed it was. The ruling was correct.

Finally, appellant complains that the trial judge erroneously excluded testimony offered to establish "the absence of complaints growing out of the sale of a large quantity of garments made *of the same cloth*." (Emphasis supplied.) It is contended that the lack of such complaints "is a relative circumstance to prove the fitness of one of such garments for *normal* use." (Emphasis supplied.) Mr. Belser, Assistant Comptroller, testified that Jelleff's had bought 15 dozen style No. 279 "brunch" coats from Pollock Brothers of Fort Wayne, Indiana. He said the only such garment not sold was one removed from stock about March 17, 1952, upon receipt of a letter from Miss Braden's lawyer. That one garment was introduced in evidence, and samples cut from it were the subject of tests in the presence of the jury and of testimony by textile experts later called as witnesses by Jelleff's.[9] Mr. Belser was asked:

"Q. Has Jelleff's had any other complaints, other than Miss Braden's with respect to the flammability of the 15 dozen brunch coats that were delivered to the store from Pollock Brothers? A. *No, this was the only one*." (Emphasis supplied.)

Plaintiff's counsel voiced objection which was sustained, when defense counsel proffered "The answer would be this is the only one." But the answer of the witness himself was not stricken nor was the jury told to disregard it. Thus, the fact was in the record for whatever weight the jury might have chosen to give to it.

The defense next called one Joseph Barbieri, the Vice President and General Manager of Pollock Brothers, Incorporated, but before he took the stand, plaintiff's counsel sought a bench conference. He told the judge:

"* * * Mr. Barbieri in each of the other trials, Mr. Connolly has asked him how many, and had they had any other complaints. I am going to anticipate that and presume the objection will extend to that question, too, that that question be not asked from the floor of this Court."

Defense counsel said:

"I want to proffer what Mr. Barbieri's answer would be. I will not ask it from the floor of the courtroom. Mr. Barbieri's testimony would be he is a person whose position at Pollock Brothers would cause complaints customarily to be brought to him, and he would have knowledge that the garments of this character are intended to be worn around the house, presumably they come in contact, people cook in them, light matches in them. As a matter of fact, his own wife has one. He has observed her in and about the house and what she does with them. She cooks in the garment. Fifty some, I can't recall whether fifty-four or fifty-five thousand [*sic*; counsel undoubtedly meant hundred, not thousand] of these garments were sold in every nook and corner of the United States and this is the only complaint of danger of flammability."

■ Whether or not the trial judge should have excluded the evidence so proffered through Mr. Barbieri raises a close question. Certainly in *negligence* actions we have ruled that the condition of a device, or a location or a physical situation may be shown to be either dangerous or safe by the occurrence or absence of other accidents.[10] It is so that

---

9. Mr. Belser testified that Jelleff's ran no flammability tests on the fabric.

10. Hayes v. Glen Echo Park Co., 1954, 94 U.S.App.D.C. 103, 215 F.2d 34; Hecht

in yet other negligence actions evidence of injuries by a product to others than the plaintiff may be received to rule out an allergy and to establish that the injury was caused by the product.[11]

This, however, is a suit for breach of implied warranty. Moreover, the warranty ran, not to unknown users, but to Miss Braden, and its breach undoubtedly could have involved in addition to its burning characteristics, faulty design, and improper length, in view of the conditions of use, as to which Mr. Barbieri was represented to be prepared to testify. We are still talking to the proffer. As we said in the Deffebach case, supra, "the only question in the case was whether or not the robe *was* reasonably fit for use as a robe."[12] In Zirpola v. Adam Hat Stores,[13] considering an action under an identical statute, the court said:

"The mere fact that only a small proportion of those who use a certain article would suffer injuries by reason of such use does not absolve the vendor from liability under the implied warranty created by the statute; otherwise, in every action to recover damages for the breach of an implied warranty, it would be necessary to show that the article sold, whether it be food or wearing apparel, would be injurious to every user."

In a later comparable suit which reached the same court the defendant, a retailer, argued that it cannot be said that goods are not reasonably fit when only a small proportion of those who use a certain article are injuriously affected thereby. Ruling to the contrary on the strength of the Zirpola case, the court pointed out that the statute is in general terms and the seller is charged whether he be a grower, a manufacturer or not.[14]

Professor Prosser observes:

"The implied warranty of merchantable quality is the most powerful weapon at the buyer's command * * *. It is a matter of contract, of interpretation of the language

Co. v. Jacobsen, 1950, 86 U.S.App.D.C. 81, 85, 180 F.2d 13; Capital Transit Co. v. Webb, 1944, 79 U.S.App.D.C. 58, 142 F.2d 757; Canadian-American Pharmaceutical Co. v. Coe, 1942, 75 U.S.App. D.C. 313, 126 F.2d 847; Lewis v. Washington Ry. & Electric Co., 1923, 52 App. D.C. 243, 285 F. 977. And see District of Columbia v. Armes, 1882, 107 U.S. 519, 524–525, 2 S.Ct. 840, 27 L.Ed. 618.

11. Carter v. Yardley & Co., Ltd., 1946, 319 Mass. 92, 64 N.E.2d 693, 164 A.L.R. 559; and proof of injury or the lack of complaint of injury to others, in the discretion of the trial court and where the facts warrant it, may be received as tending to show that a particular product is put through the same process at the same time and under the same conditions. See, e. g., Coca-Cola Bottling Co. of Henderson v. Munn, 4 Cir., 1938, 99 F.2d 190, 195; Upton v. Harrison, 4 Cir., 1934, 68 F.2d 232; Gantt v. Columbia Coca-Cola Bottling Co., 1940, 193 S.C. 51, 7 S.E.2d 641, 647, 127 A.L.R. 1185; we have permitted the introduction of evidence as to the customary method of installation and use of appliances by an industry, but we have made it clear that even proof of adherence to such a course of conduct could not displace the appropriate standard of care, whether usually complied with or not. Hellweg v. Chesapeake & Potomac Telephone Co., 1940, 71 App. D.C. 346, 348, 110 F.2d 546, 548. As to the applicability of *res ipsa loquitur* in certain products liability cases, see Fisher v. Washington Coca-Cola Bottling Works, 1936, 66 App.D.C. 7, 84 F.2d 261, 105 A.L.R. 1034.

12. "A warranty, express or implied, that rags sold are fit to be manufactured into paper, is broken, not only if they will not make good paper, but equally if they cannot be made into paper at all without killing or sickening those employed in the manufacture." Dushane v. Benedict, 1887, 120 U.S. 630, 646, 7 S.Ct. 696, 702, 30 L.Ed. 810.

13. 1939, 122 N.J.L. 21, 4 A.2d 73, 75.

14. Reynolds v. Sun Ray Drug Co., 1947, 135 N.J.L. 475, 52 A.2d 666; and see Flynn v. Bedell Co., 1922, 242 Mass. 450, 136 N.E. 252, 27 A.L.R. 1504; Bianchi v. Denholm & McKay Co., 1939, 302 Mass. 469, 19 N.E.2d 697, 121 A.L.R. 460; Cf. Brandenberg v. Samuel Stores, Inc., 1931, 211 Iowa 1321, 235 N.W. 741, 77 A.L.R. 1161; Keenan v. Cherry & Webb, 1925, 47 R.I. 125, 131 A. 309.

used in the light of the fact that the seller is a dealer, and dealers deal in merchantable goods. The only 'reliance' which it involves is reliance upon the seller's undertaking, as it is reasonably understood by the buyer. The pleasant sound of 'fitness for the purpose' should not be allowed to divert attention from one warranty to the other, or to obscure the fact that goods are merchantable only if they are fit for ordinary use. The implied warranty of merchantable quality is in fact the more important of the two." [15]

Professor James in his analysis of the bases for products liability [16] points out:

"Under a warranty or statutory violation theory, the plaintiff does not have to show that the condition was attributable to the defendant's negligence, and it is generally not a defense for the latter to show that he was not negligent." [17]

He adds, "The need for protection is as wide as the likelihood of this kind of harm, and all such harm may fairly be regarded as a casualty of the supplier's enterprise." [18]

It is surely so that proof that an indefinite number of customers had bought rolls not containing pebbles would not negate the presence of the pebble in the Cushing case. [19] Similarly the lack of complaints from such customers would not tend to prove that a roll containing a pebble was reasonably fit to be eaten. It was the duty of the trial judge to determine relevancy in terms of the worth of the proffer. "Each single piece of evidence must have a plus value," [20]

something more than a minimum in a probative sense. Here the proffer as to what might have been elicited through Mr. Barbieri did not include a showing of a duplication of the conditions under which Mrs. Barbieri wore her garment. There was nothing to indicate that those pertaining to his wife's use were the same as those described by Miss Braden. Certainly the fact that Mrs. Barbieri's garment did not take fire does not prove that its material was the same as that in Miss Braden's garment or that the fabric in the latter was more or less likely to become ignited and to burn. The manufacturer, Pollock Brothers, Inc., had cut garments from the "same" cloth throughout 1950–1951. There was no showing as to the period covered by the absence of complaints, or as to when any particular number of garments had been sold by the manufacturer, either before or after the date of Miss Braden's mishap, except those sold to Jelleff's. At most Mr. Barbieri could have said that he had heard of no complaints of flammability from purchasers of such numbers of garments as had been made from the 26,000 yards of Leo-Tex delivered to his company in 1951. If Leo-Tex, and not Cohn-Hall-Marx, had made the particular fabric in question, Mr. Barbieri did not know where Leo-Tex got its material, who wove it, who put the binder on it before it was colored, who put the color on it, or who printed the cloth. Against the proposed vague, negative hearsay as to possibly similar conditions or circumstances in other instances, Mr. Barbieri testified affirmatively that his company "did not run any flammability test on any of these goods."

---

15. Prosser, Warranty of Merchantable Quality, 27 Minn.L.Rev. 117, 168 (1943).

16. James, Products Liability, 34 Texas L. Rev. 44 (Nov. 1955), Id., Part 2, 192 (Dec. 1955).

17. Id. at 226.

18. Id. at 227. In our landmark case of Cushing v. Rodman, 1936, 65 App.D.C. 258, 265, 82 F.2d 864, 871, 104 A.L.R. 1023, the late Chief Judge Stephens spoke for the full court in holding that where a plaintiff broke a tooth when biting upon a pebble concealed in a roll, "there is an implied warranty that the food is wholesome, for breach of which an action lies for the recovery of consequential damages."

19. Supra note 18.

20. 1 Wigmore, Evidence, p. 410, § 28; and see §§ 437, 444 et seq. (3d ed. 1940); cf. Model Code of Evidence, rule 303 (1942).

■ Even so, we will not be heard to say that the trial judge would have erred had he admitted evidence as to the absence of complaints from other customers concerning flammability of garments manufactured by Pollock. The question, under the circumstances, was for the trial judge. In the absence of a showing of a clear abuse of discretion, we will not say that he erred in excluding evidence along the line indicated by the proffer.[21] We are satisfied that in any event no substantial rights of the parties were affected.[22]

■ We are fortified in our conclusion in that the trial judge permitted demonstrative testimony by three experts. The defense was permitted to perform experiments before the jury and fully to explain the findings of the experts, both in and out of the courtroom. Their burning tests included various cotton fabrics quite different from that used in Miss Braden's garment with its bronze metallic overlay. They experimented with samples taken from a coat in Jelleff's stock, manufactured by Pollock Brothers, at least like, if not exactly the same as that worn by Miss Braden. Far superior to negative testimony from some 5,000 or more unknown users under conditions not described, the evidence of the experts afforded to the defense the full intendment to which it was entitled with respect to the claims advanced. On the other hand, as one of the defendant's experts testified that perhaps two seconds, "something in that order" would be involved in ignition, he also estimated that for Miss Braden to reach up to get a can of sugar "would take somewhere between one and two seconds, maybe more." It was testified that the burning rate for a garment, such as Miss Braden's, when in vertical position was three times as fast as that in the tests described. As defense counsel put it in his hypothetical questions: "She [Miss Braden] said it went up so fast that 'I couldn't get the canister down in time to put my arms down to protect myself.' "

All in all, the jury could have concluded that the industry technicians here were seeking to limit the plaintiff to a standard of their own devising. There was no showing that Pollock Brothers had made any tests whatever to discover possibly defective material. Certainly it positively appeared that neither Jelleff's nor Pollock Brothers had run flammability tests on the material utilized. Mr. Barbieri testified that someone had removed the label from the Pollock-made garment in evidence, and he "presumed" it had been washed. No one testified to the contrary. Washing would have the effect of retarding the rate of igniting and burning the samples tested before the jury, the evidence disclosed. We need not particularize further.

The defense having failed to make a showing that the trial judge abused his discretion in excluding the proffered testimony, or that the appellant was prejudiced as a result, we are satisfied the ruling must stand. The case was well tried by capable counsel and both sides ably advanced their respective claims. In the circumstances disclosed, the retailer must have assumed some risk of loss which in due course could be passed back to the manufacturer, as indeed Jelleff's has actually sought to do. Such losses, no doubt, are part of the cost of

21. Landfield v. Albiani Lunch Co., 1929, 268 Mass. 528, 168 N.E. 160; New York Canners, Inc., v. Milbourne, 1928, 247 N.Y. 460, 160 N.E. 914; James K. Thomson Co. v. International Compositions Co., Inc., 1920, 191 App.Div. 553, 181 N.Y.S. 637; Altkrug v. William Whitman Co., 1919, 185 App.Div. 744, 173 N.Y.S. 669.

22. 63 Stat. 105 (1949), 28 U.S.C. § 2111 (1952); "Mere 'technical errors' which do not 'affect the substantial rights of the parties' are not sufficient to set aside a jury verdict in an appellate court. * * * He who seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted. That burden has not been maintained by petitioners." Palmer v. Hoffman, 1943, 318 U.S. 109, 116, 63 S.Ct. 477, 482, 87 L.Ed. 645.

doing business, not to be borne by an injured customer alone, but by those who profit from the transaction. The industry as a whole may be deemed to underwrite the implied warranty. That is why we have the statute on which the action was based.

On the whole record it was for the jury to say whether the garment was reasonably fit. Upon its finding that it was not, a breach of implied warranty was established, and the plaintiff is entitled to her verdict.

Affirmed.