Troy V. POST, Jr., Appellant,

v.

UNITED STATES of America,
Appellee.

Bill M. ALLEN, Appellant,

v.

UNITED STATES of America,
Appellee.

Leroy W. PICKETT, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 20861–20863.

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 5, 1967.

Decided Oct. 15, 1968.

Certiorari Denied Feb. 24, 1969.
See 89 S.Ct. 863.

**320**

Mr. Raymond W. Bergan, Washington, D. C., with whom Mr. Thomas R. Dyson, Jr., Washington, D. C., was on the brief, for appellants.

Mr. Roger A. Pauley, Atty., Department of Justice, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Messrs. David G. Bress, U. S. Atty., and Frank Q. Nebeker, Asst. U. S. Atty., were on the brief, for appellee. Mr. Scott R. Schoenfeld, Asst. U. S. Atty., also entered an appearance for appellee.

Before FAHY, Senior Circuit Judge, and WRIGHT and ROBINSON, Circuit Judges.

**SPOTTSWOOD W. ROBINSON, III, Circuit Judge:**

Appellants were convicted by a jury of conspiracy [1] and mail fraud [2] stemming from their activities in the promotion of Lakewood Country Club, in the area of Rockville, Maryland, and the concomitant sale of memberships therein. On these appeals, they allege error in three rulings by which evidence was excluded as irrelevant to their efforts to show their good faith in transactions impugned by the indictment. They also attack an instruction which defined for the jury appellants' criminal liabilities as promoters of the club. Two additional contentions which they advance are effectively foreclosed by decisions rendered subsequent to their trial.[3]

---

1. "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both." 18 U.S.C. § 371.

2. "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or author-

ized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both." 18 U.S.C. § 1341.

3. The argument that the trial judge erred in giving the "Allen charge," Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1892), is frustrated by Fulwood v. United States, 125 U.S.App. D.C. 183, 369 F.2d 960 (1966), cert. denied 387 U.S. 934, 87 S.Ct. 2058, 18 L. Ed.2d 996 (1967). The claim that the indictment should have been quashed be cause of delay incidental to its procurement is nullified by Tynan v. United States, 126 U.S.App.D.C. 206, 207–209, 376 F.2d 761, 762–764, cert. denied 389

In the summer of 1958, appellants conceived the blueprint for a new country club to be developed in the vicinity of Washington.[4] Locating a suitable site in 1959, they organized four corporations through which the club was to be established and operated,[5] and embarked upon the promotional phase from which emanated the events giving rise to the indictment. An advisory board, generally nonfunctional, of well known citizens was organized, a sales office was opened and a sales staff hired, and a thoroughgoing campaign for members was launched. There was extensive newspaper advertising, and tens of thousands of direct mail advertisements were sent to area residents. The promotional literature was issued under the apparent auspices of the advisory board, and appellants' names were omitted.

Opportunities for affiliation with the incipient club assumed the form of $1,000 life memberships and $300 regular memberships, and the distinctive characteristics of each were publicly proclaimed. Life members would be immunized from all dues, assessments and minimum spending requirements, but regular members would be required to pay monthly dues. Life memberships would also be in "limited number;" applicants therefor were told that their ratio to others would be about one in ten, and the maximum number was variously fixed between 100 and 300. By October 1, 1960, however, 1,124 life memberships had been sold, as compared with only 719 regular memberships, and the club's bylaws, when distributed, authorized the directors—appellants' appointees —to impose a minimum spending requirement upon all members irrespective of class.[6]

Appellants' promotional crusade met instant and spectacular success, garnering membership fees aggregating more than $1,250,000.[7] While membership solicitations continued unabatedly, construction of the club's facilities got under way, and proved to be a lucrative enterprise for appellants. Acting through their wholly-owned corporations,[8] they turned handsome profits on a land lease to the club[9] and on contracts for the construction of its facilities.[10] They were also paid more than

---

U.S. 845, 88 S.Ct. 95, 19 L.Ed.2d 111 (1967), which requires prejudice—a condition the record here negates—resulting from the delay. There is no occasion for us to reconsider these decisions. See District of Columbia v. Grimes, 131 U.S. App.D.C. 360, 404 F.2d 1337 (March 28, 1968) at 9–10 (concurring opinion) and cases cited.

4. Their plan, they say, was to create a golf and country club complex which they would own and manage, and from which they would reap all profits. Lacking experience in such matters, they proposed to engage the necessary professional personnel to make the project work.

5. One, Lakewood Country Club, Inc., was a nonstock nonprofit corporation, no part of the net earnings of which could inure to the benefit of any director or member. Its directorate consisted of three of appellants' friends, and it was to be the sublessee of the club premises. The others, all business corporations of which appellants were the sole stockholders and directors, were P.A.P., Inc., which was to be the lessee, and in turn the sublessor to Lakewood Country Club, Inc., of the club property; Lakewood Management Corporation, which was to operate the club; and Country Club Developers, Inc., which, as prime contractor under agreement with Lakewood Management Corporation, was to build the club's facilities.

6. This requirement, however, was never invoked while appellants operated the club.

7. In addition to this amount, more than $250,000 was also collected from members for excise taxes.

8. See note 5, *supra*.

9. The club site was leased to P.A.P., Inc., for 50 years at an annual rental of $15,-000, and with the lease was coupled an option to purchase. P.A.P., Inc., subleased to Lakewood Country Club, Inc., at a rental of $60,000 annually for three years only—meaning, necessarily, renegotiation at the end of that term.

10. Country Club Developers, Inc., contracted with Lakewood Country Club,

$200,000 during a 20-month period in salaries, commissions and fees pursuant to a variety of intracorporate arrangements. In addition, they advanced from the monies collected for initiation fees large sums to other country clubs in which they were financially interested.[11] The evidence warranted the conclusion that Lakewood's membership, actual and potential, remained unaware of appellants' proprietary stake in the country club complex and the extent to which they were profiting from it.

By the fall of 1960, the club's funds were exhausted, and construction on its clubhouse came to a halt.[12] A membership meeting in December culminated in the election of a new board of directors, which during the next several months endeavored unsuccessfully to negotiate an accord with appellants. Finally, in March, 1961, suit was filed in the District Court for the District of Columbia seeking a conservatorship, the ouster of appellants, and the recapture of monies claimed to have been wrongfully diverted.[13] On March 31, 1961, a conservator was appointed for all of the corporations involved in the affair, and appellants were prohibited from further operation of the club. Thereafter, in February, 1962, the litigation was settled by a consent order.[14]

The indictment leading to appellants' convictions charged, in substance, ma-terial misrepresentation associated with the sale of memberships, including the use of the names of the advisory committee members, the statements as to the "limited number" of life memberships and their nonassessable character, and the nondisclosure of appellants' interests in and their profiteering from the club. At the trial, the core question was whether Lakewood Country Club was, as the Government contended, a scheme to defraud prospective members or was, as appellants insisted, a legitimate business venture that unexpectedly and unfortunately failed. Appellants concede that the record contains evidence which amply supports the jury's verdicts.[15] They urge, however, that by virtue of the three exclusionary rulings, the jury was precluded from hearing evidence critical to their defense, and that, in consequence of the instruction under assault, was inadequately informed as to the Government's burden of proof and the criminal intent prerequisite to conviction. With these contentions we do not agree, and we accordingly affirm the convictions.

I

We approach our review, against the factual backdrop summarized, of the three exclusionary rulings advertent to familiar admonitions validated by generations of judicial experience. "It is for ordinary minds," we are instructed,

Inc., for the construction of facilities, and then subcontracted with others for the actual work at much lower costs. Among the facilities as to which there were substantial price differentials were the clubhouse ($625,000 and $543,000), the golf course ($245,000 and $165,000) and the tennis courts ($43,500 and $16,000).

11. One such transaction was a $63,000 transfer to Golf Contractors, Inc., a Texas company owned by appellants, which is discussed in Part III, infra.

12. Other facilities, including the golf course and swimming pools, were completed and in use. Testimony for the Government made the point that all facilities could "easily" have been constructed from the monies collected during the first few months of the membership campaign.

13. Lakewood Country Club, Inc. v. Post, Civil No. 805–61 (D.D.C. filed March 15, 1961). See also Lee v. Post, Civil No. 1157–61 (D.D.C. filed April 17, 1961), which was instituted by the conservator after his appointment.

14. Discussed in Part IV, infra.

15. The indictment charged each appellant in one count of conspiracy, see note 1, supra, and 19 substantive counts of mail fraud, see note 2, supra. Three counts were withdrawn or dismissed at the close of the Government's case in chief. The jury convicted each appellant on the conspiracy count and 13 of the substantive counts, and acquitted on each of the remaining four.

"not for psychoanalysts, that our rules of evidence are framed. They have their source very often in considerations of administrative convenience, of practical expediency, and not in rules of logic." [16] Not the least of the evidentiary principles so shaped are those by which the relevance of proffered evidence is to be measured.

An inevitable concomitant of the Anglo-American legal system, with its sharp distinction in function between judge and jury, is "the rough and practical quality * * * noticeable in the whole law of probative value." [17] This is because "the Court will of course allow to be considered only such evidence as is worth submitting to men who will judge only by the most common and practicable tests." [18] As an even more significant consequence, "the effect is to require a generally higher degree of probative value for all evidence to be submitted to a jury than would be asked in ordinary reasoning." [19] For "[t]he Judge, in his efforts to prevent the jury from being satisfied by matters of slight value, capable of being exaggerated by prejudice and hasty reasoning, has constantly seen fit to exclude matter which does not rise to a clearly sufficient degree of value." [20]

These factors, in turn, define broadly the dissimilar roles trial and appellate judges play in scrutinizing evidence the pertinence of which is in issue. "It is the duty of the trial judge," we have declared, "to determine relevancy in terms of the worth of the proffer. 'Each single piece of evidence must have a plus value,' something more than a minimum in a probative sense." [21] Just how much more is a determination which by its very nature, of course, exacts a careful and often difficult estimate in the context of all else that the trial involves. The very considerations that condition a criminal conviction upon incriminating proof beyond a reasonable doubt entitle the accused to ample latitude in evidentiary presentations from which such a doubt might fairly arise. On the other hand, the possibilities of confusion and false deduction from circumstances of nebulous significance are real dangers that cannot be casually ignored. Trial judges, occupying an excellent vantage point, must be afforded leeway in striking the balance,[22] a most delicate task when, as in the case at bar, the operations of the human mind are to be probed.[23]

Appellate judges, on the other hand, must accord to trial rulings on relevance a respect commensurate with the occasion.[24] "There is no bright line that divides evidence worthy of consideration by a jury, although subject to heavy counterattack, from evidence that

16. Shepard v. United States, 290 U.S. 96, 104, 54 S.Ct. 22, 25, 77 L.Ed. 1472 (1933).

17. 1 J. Wigmore, Evidence § 28 at 409 (3d ed. 1940).

18. *Ibid.*

19. *Ibid* (emphasis omitted).

20. *Id.* at 409–410.

21. Frank R. Jelleff, Inc. v. Braden, 98 U.S.App.D.C. 180, 188, 233 F.2d 671, 679, 63 A.L.R.2d 400 (1956), quoting 1 J. Wigmore, Evidence § 28 at 410 (3d ed. 1940).

22. See Vareltzis v. Luckenbach S.S. Co., 258 F.2d 78, 81 (2d Cir. 1958); Miller v. Alexandria Truck Lines, 273 F.2d 897, 900–901 (5th Cir. 1960); Metropolitan Life Ins. Co. v. Armstrong, 85 F.2d 187, 193 (8th Cir. 1936).

23. See Glasser v. United States, 315 U.S. 60, 81, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

24. The complexities of appellants' operations are portrayed vividly in the enormous record built in the District Court. The trial consumed 34 days over an eight-week period. Numerous witnesses testified on the ramified factual issues, and each side introduced scores of exhibits. The jury deliberated for 20 hours over four days, returning once to have the entire charge repeated, and again to report its then inability to agree. See note 3, *supra*.

is not,"[25] and we are not unmindful of "the inescapable remoteness of appellate review."[26] With these twin handicaps, we perform our reviewing function both carefully and deferentially lest "the perspective of the living trial is lost in the search for error in a dead record."[27] When the issue is close, relevance is primarily for the trial judge to gauge,[28] and we will not lightly overrule his considered judgment.[29]

## II

In opposition to the Government's charge of conspiratorial and fraudulent conduct, appellants maintained that their constant aim was to provide the Lakewood members with all that had been promised. To support that claim, appellants were permitted to introduce evidence tending to show efforts, after as well as before the conservator's appointment, to extricate the club from its financial difficulties. On the same theory —relevance to good faith—appellants proffered a post-conservatorship proposition which, if consummated, would have provided one of several possible solutions of the problem.

This proposition was an offer, made subject to approval by the members and the court, to pay appellants $100,000 for their interests in the club, the offeror to complete the club's facilities and operate them for the members. The offer called for the alternative imposition of monthly dues or a minimum spending requirement upon life members, the option in this regard to be theirs. The membership, however, rejected this proposal, and the trial judge excluded it from the evidence. Because the offer was negotiated after the conservatorship,[30] and was conditioned upon a relationship between the members and the club different from that which appellants had represented, the judge did not consider its virtues sufficient to elevate it to a good faith showing.

■ Acts occurring subsequent to a supposed criminal offense may in particular circumstances constitute admissible evidence bearing on innocence.[31]

---

25. Herman Schwabe, Inc. v. United Shoe Mach. Corp., 297 F.2d 906, 912 (2d Cir.), cert. denied 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962).

26. Luck v. United States, 121 U.S.App. D.C. 151, 157, 348 F.2d 763, 769 (1965).

27. Glasser v. United States, *supra* note 23, 315 U.S. at 88, 62 S.Ct. at 473 (dissenting opinion).

28. "Even in judicial trials, the whole tendency is to leave rulings as to the illuminating relevance of testimony largely to the discretion of the trial court that hears the evidence. [Citations omitted] Courts of Appeal are less and less inclined to base error on such rulings." NLRB v. Donnelly Garment Co., 330 U.S. 219, 236, 67 S.Ct. 756, 765, 91 L.Ed. 854 (1947).

29. "In the absence of a showing of a clear abuse of discretion, we will not say that he erred * * *." Frank R. Jelleff, Inc. v. Braden, *supra* note 21, 98 U.S. App.D.C. at 189, 233 F.2d at 680. See also Hannan v. United States, 76 U.S. App.D.C. 118, 120, 131 F.2d 441, 443 (1942); Maryland Cas. Co. v. Citizens State Bank, 84 F.2d 172, 174 (5th Cir.

1936); Brigham Young Univ. v. Lillywhite, 118 F.2d 836, 841, 137 A.L.R. 598 (10th Cir. 1941). And see the cases cited *supra* notes 22 and 27.

30. The offer, and the evidence excluded by the rulings considered in Parts III and IV, *infra*, emanated from transactions occurring after the appointment of the conservator for the Lakewood-connected corporations. From this circumstance, appellants argue that the trial judge established the date of the conservator's appointment as an arbitrary cutoff point for evidence that might illuminate appellants' conduct. We do not find this to be so. Appellants were permitted to undertake proof of other transpirations after as well as before the conservatorship. Only with respect to the offer discussed in this Part did the judge deem the post-conservatorship character of the proffered item of sufficient importance to the ruling to justify mention, and even here the ruling also rested upon an additional consideration.

31. See Starke v. State, 31 Ala.App. 322, 16 So.2d 426, 427 (1944); Boston v. State, 94 Ga. 590, 21 S.E. 603 (1894).

By the same token, an event superficially indicative of bad faith conceivably may be shown by a later transpiration to have actually involved a completely wholesome state of mind.[32] On the other hand, an ever-present reason demanding latitude for the ruling on admissibility is that what takes place, particularly after the fact, is "often feigned and artificial." [33] While the judge's function does not extend to a flat decision as to whether it is or not, it is his responsibility to calculate and weigh the propensities of the proffered evidence in both directions in determining whether it has a "plus value" favoring its admission.[34]

Even if, in the case at bar, the trial judge believed that the proposition in question was free from taint of artificiality, the fact remains that. it embodied rights and liabilities of membership dissimilar to what they had previously appeared to be. The most salient feature of life memberships, as advertised in appellants' campaign, was their freedom from additional financial burdens. In specifying the onus of dues or a minimum spending requirement on life memberships, the offer departed radically from the assurances that had inspired their purchase.

■ Moreover, one of the principal complaints against appellants was that they concealed their proprietary interests in the club and their arrangements for personal profit. The offer called for the payment of $100,000 to appellants for those interests, and the vesting of the club's ownership and operation solely in the offeror. Viewed, as well it could be, as a salvage effort by appellants at the expense of the life members, the proposal had little or no tendency to demonstrate appellants' good faith in the dealings to which the indictment referred.

### III

We have mentioned that some of the monies collected from the sale of memberships in Lakewood Country Club were devoted to projects unrelated to the development of the club.[35] One such diversion served a complicated transaction involving Golf Contractors, Inc., a Texas corporation owned by appellants, and Glen Haven Club, Inc., another Texas corporation. Appellants and Golf Contractors contracted to construct a golf course for Glen Haven, and two of the Lakewood-related corporations,[36] then dominated by appellants, advanced approximately $63,000 to Golf Contractors for the job. This loan, to be liquidated from Glen Haven's payments to Golf Contractors, was evidenced by notes payable to Golf Contractors and secured by a deed of trust on the Glen Haven property.

After appellants were removed from control of the Lakewood complex, the Texas club [37] obtained a $500,000 loan. On settlement of that loan, $82,000 [38] was deducted and forwarded to the Lakewood conservator, pursuant to arrangements previously made by him, to enable

---

32. See, *e.g.*, Hayes v. United States, 227 F.2d 540, 543 (10th Cir. 1955), cert. denied 353 U.S. 983, 77 S.Ct. 1280, 1 L.Ed. 2d 1142 (1957).

33. 2 J. Wigmore, Evidence § 293 at 189 (3d ed. 1940).

34. Text *supra* at note 21.

35. Text *supra* at note 11.

36. These were Lakewood Country Club, Inc., and Country Club Developers, Inc. See note 5, *supra*.

37. Through a change of name accompanying the amendment and restatement of its articles of incorporation, Glen Haven Club, Inc., had in the meanwhile become Sandy Lakes Country Club, Inc.

38. The reason for the discrepancy between the $63,000 borrowed and the $82,000 repaid is not apparent from the record. Appellant Post testified that Golf Contractors spent about $102,000 on the Glen Haven course, evidenced by Glen Haven's notes totalling that amount, but only three of the notes, aggregating approximately $53,000, were placed in evidence. From this we can only assume that Golf Contractors had some additional source of funds.

a release of Golf Contractor's deed of trust on the Texas property.[39]

The Government's case revealed the $63,000 advance to Golf Contractors, and appellants sought to show its eventual repayment as a circumstance signifying their good faith and the soundness of the loan from a business viewpoint. The trial court, after hearing counsel extensively, held that they could not do so, and this determination we are invited to upset.

Appellants' proffer did not intimate that, aside from arranging the terms and security for repayment of the loan, they played any role in connection with the return of the monies to the conservator.[40] The tendered evidence could hardly have shed light upon appellants' earlier intentions when the memberships were solicited; at best, it might have suggested that the advance was a sound business investment rather than a reckless disposal of funds.[41] But this fact was also irrelevant for, despite the apparent safety of the maneuver, it was nonetheless an impermissible diversion of the club's cash for appellants' own gain. They solicited the funds by representing that they would be devoted to construction of the Lakewood club in Maryland, but used the funds, with a view to personal profit, for the construction of the Glen Haven course in Texas. That the loan was safeguarded, or was eventually repaid, could not alter the situation; the calculated, improper use of the money was itself an act of fraud which, when coupled with the precedent use of the mails to enable its perpetration, made the offense complete.[42] And the fact of repayment could, in the circumstances, contest neither the deliberate nature of the digression nor its underlying motivation.[43] Moreover, we are alert to the possibility of which the trial judge was forewarned, that admission of the evidence would have added a broad collateral area to an already lengthy and complicated trial.[44] We think the trial judge remained on firm ground in rejecting it.

## IV

Lakewood Country Club's litigation against appellants was terminated by a consent order following a settlement agreement pursuant to which appellants

39. Golf Contractors came into the conservatorship several months after it was established.

40. So far as the proffer discloses, the arrangement therefor was made and conducted solely by the Lakewood conservator and the title insurance company settling the loan.

41. That fact was inferable from the notes evidencing the promise to repay and the deed of trust securing the notes, both of which were placed in evidence at the trial.

42. Use of the mails in furtherance of a scheme to defraud constitutes mail fraud, Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954); Deaver v. United States, 81 U.S.App.D.C. 148, 151, 155 F.2d 740, 743, cert. denied 329 U.S. 766, 67 S.Ct. 121, 91 L.Ed. 659 (1946), and pecuniary loss by the victim is not an element of the offense. Deaver v. United States, *supra*, 81 U.S.App.D.C. at 150, 151, 155 F.2d at 742, 743; United States v. Andreadis, 366 F.2d 423, 431 (2d Cir. 1966), cert. denied 385 U.S.

1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967); Adjmi v. United States, 346 F.2d 654, 657 (5th Cir.), cert. denied 382 U.S. 823, 86 S.Ct. 54, 15 L.Ed.2d 69 (1965). See also Shaddy v. United States, 30 F.2d 340 (8th Cir. 1929); Butler v. United States, 53 F.2d 800 (10th Cir. 1931).

43. This is particularly true in light of the fact that the funds were actually returned to Golf Contractors, the Texas company wholly owned by appellants, not to the Lakewood complex, in payment of the notes and for release of the deed of trust held by Golf Contractors, not the Lakewood complex. There was nothing in the proffer to connect either the security arrangements to appellants' dealings on behalf of Lakewood Country Club, as opposed to their dealings on behalf of their own corporation, Golf Contractors.

44. The prosecuting attorney informed the trial judge that admission of the evidence would impel him to demonstrate the conservator's efforts to retrieve the funds, and appellants' attempts to interfere with the conservator's efforts.

relinquished their interests in the Lakewood-connected corporations in exchange for a general release from civil liability arising out of their promotional and managerial activities. The settlement agreement in part provided:

"It is agreed that all sums heretofore disbursed to or for the benefit of [appellants] or any of them, and/or their agents, whether corporate or otherwise, shall be considered to be full and reasonable consideration for any and all services heretofore rendered by them to * * * Lakewood Country Club, Inc."

Appellants sought to introduce this provision into evidence as a recognition by the representatives [45] of the allegedly defrauded club members that the monies which appellants had used personally were but fair compensation for their services to the club.[46] This, appellants say, in turn indicated that the members were satisfied, and bore importantly upon their good faith while in control of the club's affairs. The trial judge disagreed and rejected the proffer, and we think that he was entirely correct in doing so.

■ The settlement agreement does not purport to compose any criminal transgression, and we would deny it legal effect to that extent if it did.[47] We do not, however, gainsay the value to appellants of a showing that they earned the money which they kept for themselves, nor do we dispute their contention that evidence of satisfied customers is admissible in a mail fraud case to show an absence of fraudulent intent.[48] But the settlement instrument states, consistently with what is evident from its context, that its "only purpose [is] to prevent further litigation and to secure a release and discharge of all controversies and disputes which might exist between the parties by virtue of the claims asserted, as well as those which might have been asserted. * * "

■ In a transaction so obviously a product of the parties' mutual desire to buy peace, we cannot isolate a reflection of the members' satisfaction with appellants' handling of the club's funds, or a recognition of their entitlement to those which they appropriated.[49] Relinquishment of rights, cancellation of liabilities, acceptance of unwanted covenants, and suppression of hostile emotions are commonplace, if indeed not well nigh inevitable, in the give-and-take of compromise,[50] and we discern nothing in this situation to provide an exception.

---

45. Lakewood Country Club, Inc. v. Post, *supra* note 13, was a class action brought by the club's then directors on behalf of the club. Lee v. Post, *supra* note 13, was brought by the conservator. These actions were later consolidated.

46. Appellants, pointing to the fact that the civil litigation had been mentioned at the trial, also urge that considerations of *fairness dictated admission of the set-* tlement agreement to inform the jury that their "final disassociation" from the club came in consequence of an interparties accord rather than permanent ouster by the court. Any need in this regard was supplied by appellant Post's testimony that the suit had been settled and that appellants thereafter had no further association with any of the Lakewood-related corporations.

47. See Savitt v. United States, 59 F.2d 541, 544 (3d Cir. 1932); Seals v. United States, 221 F.2d 243, 249 (8th Cir. 1955); Commonwealth v. Spiegel, 169 Pa.

Super. 252, 82 A.2d 692 (1951); State v. Cooper, 120 S.C. 280, 113 S.E. 132 (1922). *Cf.* Chambers v. Buroughs, 44 App.D.C. 168, 173–174 (1915), cert. denied 239 U.S. 649, 36 S.Ct. 284, 60 L.Ed. 485 (1916).

48. Worthington v. United States, 64 F.2d 936, 940 (7th Cir. 1933); United States v. Hanrahan, 255 F.Supp. 957, 969 (D. D.C.1966), aff'd sub nom. Tynan v. United States, *supra* note 3.

49. Compare Ecklund v. United States, 159 F.2d 81, 83–85 (6th Cir. 1947).

50. As Dean Wigmore has stated, a compromise effort "does not ordinarily proceed from and imply a specific belief that the adversary's claim is well founded, but rather a belief that the further prosecution of that claim, whether well founded or not, would in any event cause such annoyance as is preferably avoided by the payment of the sum offered." 3 J. Wigmore, Evidence § 1061 at 28 (3d ed. 1940).

The settlement agreement offered the triers of fact no clear choice respecting the membership's real attitude toward appellants' financial diversions, and it was well within the province of the trial judge to refuse to allow the jury to speculate.

## V

Appellants, as we have observed, also challenge the so-called "promoter instruction" by which the trial judge delineated for the jury's edification appellants' obligations as promoters toward Lakewood Country Club and its members.[51] They argue for reversal on the ground that the promoter concept obtains in criminal law only with respect to stock corporations, and that it becomes anomalous when applied to. a nonprofit enterprise

such as was involved here. They insist, too, that the instruction equated a breach of the promoter's fiduciary duty with the knavery essential to a conviction for mail fraud, thereby lowering the Government's burden of proof. We disagree with each of these contentions.

By elementary legal principles, promoters stand in a fiduciary relationship exacting good faith in their intracompany activites and demanding adherence to a high standard of honesty and frankness.[52] Not the lesser of the promoter's manifold responsibilities outlaw secret profit-making and command the dedication of corporate funds to corporate purposes.[53] And it cannot be doubted that promoters of stock corporations who employ the mails in deceitful violation of

---

51. The instruction reads:

"The jury are instructed that a promoter is a person who sets in motion machinery that brings about the incorporation and organization of a corporation, brings together the persons interested in the enterprise to be conducted by the corporation, aids in inducing persons to become members of the corporation, and in procuring from them membership fees to carry out purposes set forth in the corporation's articles of incorporation.

"If from the evidence in this case the jury should find beyond a reasonable doubt that the defendants were promoters of Lakewood Country Club, Inc., then you are instructed that the defendants stood in a fiduciary relation to both the corporation as a separate legal entity and the members, including those persons who it was to be anticipated would make application to and would become members in Lakewood Country Club, Inc. Such a fiduciary relationship on the part of the defendants, should you find them to be the promoters of the Lakewood Country Club, Inc., required that they exercise the utmost good faith in their relations with the corporation and the members, including fully advising the corporation and members, and persons who it was to be anticipated would become members, of any interest which the defendants had that would in any way affect the corporation, the members and anticipated members. Such a full disclosure requirement, if you should find the defendants to be promoters, would obligate them to faithfully make known all facts which

might have influenced prospective members in deciding whether or not to purchase memberships. And this full disclosure would include the duty to refrain from misrepresenting any material facts, as well as the duty to make known any personal interest the defendants had in any transaction relating to the country club enterprise.

"Also you are instructed that if you should find beyond a reasonable doubt that the defendants were promoters of the Lakewood Country Club, Inc., and that the funds obtained by them from members of the club corporation to accomplish the purposes of the corporation were used by them for the club's benefit, they were properly used. On the other hand, if you should find beyond a reasonable doubt that the defendants were the promoters of the club corporation, and that they had intentionally converted those funds to their own personal use, such would be a fraud on the members of the club corporation, since such funds were in the nature of trust funds as to which the defendants had a fiduciary obligation. And in that connection you are further instructed that for promoters to knowingly use their fiduciary position to obtain secret profits at the expense of the corporation or its members would not only be a breach of that fiduciary duty but an act of fraud."

52. See generally, H. Ballantine, Corporations §§ 356–360 (rev.ed.1946); 1 W. Fletcher, Corporations §§ 192–196 (1963 rev.vol.).

53. *Ibid.*

their fiduciary obligations may incur the full condemnation of the law.[54]

We perceive no basis, either in law or in logic, for restricting these precepts to stock corporations.[55] The undergirding considerations are equally germane and potent when a person buys his membership in a nonstock corporation as when stock in a business corporation is purchased. In each case, the purchaser relinquishes his money in the expectation that it will be used in a manner beneficial to his interest in the corporation and consistent with the representations that induced the transaction. We see no reason why the fiduciary concept, which does service in mail fraud prosecutions in the context of both membership and stock organizations,[56] should not have the same range specifically in relation to promoters. We hold that the promoter of a corporation, whether stock or nonstock, as a fiduciary owes a corporate constituent, be he stockholder or member, the same duties of good faith and fair dealing.[57]

We do not quarrel with the doctrines upon which appellants pitch their second protest against the instruction. Active rather than constructive fraud is prerequisite to conviction for mail fraud.[58] Mere breach of fiduciary

obligation does not itself constitute active fraud;[59] there must be a specific intent to defraud.[60] The flaw in appellants' argument, however, is that the instruction given in this case is entirely harmonious with these rules. Among other things, it informed the jury:

> "[I]f you should find beyond a reasonable doubt that the defendants were the promoters of the club corporation, and that they had *intentionally converted* those funds to their own personal use, such would be a fraud on the members of the club corporation, since such funds were in the nature of trust funds as to which the defendants had a fiduciary obligation. And in that connection you are further instructed that for promoters to *knowingly use* their fiduciary position to obtain secret profits at the expense of the corporation or its members would not only be a breach of that fiduciary duty but an act of fraud." [61]

By explicating a knowledgeable or purposeful breach of fiduciary duty as an essential characteristic of the conduct upon which a conviction might be rested, the instruction plainly and correctly defined a major type of dishonesty for the facilitation of which the mail fraud statute penalizes the use of the postal service.[62]

54. United States v. Painter, 314 F.2d 939 (4th Cir.), cert. denied 374 U.S. 831, 83 S.Ct. 1873, 10 L.Ed.2d 1054 (1963). See United States v. Holsman, 238 F.2d 141 (7th Cir. 1956); Bobbroff v. United States, 202 F.2d 389 (9th Cir. 1953).

55. We are unaware of any case treating the applicability of the promoter concept to a nonstock corporation.

56. See United States v. Groves, 122 F.2d 87, 90 (2d Cir.), cert. denied 314 U.S. 670, 62 S.Ct. 135, 86 L.Ed. 536 (1941); United States v. Hoffa, 205 F.Supp. 710, 716 (S.D.Fla.), cert. denied Hoffa v. Lieb, 371 U.S. 892, 83 S.Ct. 188, 9 L. Ed.2d 125 (1962).

57. The situation here is essentially unlike that presented in Old Dominion Copper Co. v. Lewisohn, 210 U.S. 206, 28 S.Ct. 634, 52 L.Ed. 1025 (1908), relied on by appellants. Compare McCandless v. Furland, 296 U.S. 140, 157–159, 56 S.Ct. 41, 80 L.Ed. 121 (1935).

58. Shushan v. United States, 117 F.2d 110, 115, 133 A.L.R. 1040 (5th Cir. 1941); Epstein v. United States, 174 F.2d 754, 765–766 (6th Cir. 1949).

59. See Epstein v. United States, *supra* note 58, 174 F.2d at 766; United States v. Hoffa, *supra* note 56, 205 F.Supp. at 715–716.

60. United States v. Brandt, 196 F.2d 653, 657 (2d Cir. 1952); United States v. Shavin, 287 F.2d 647, 649–650, 90 A.L. R.2d 888 (7th Cir. 1961), cert. denied 375 U.S. 944, 84 S.Ct. 349, 11 L.Ed.2d 273 (1963); Williams v. United States, 278 F.2d 535, 537 (9th Cir. 1960).

61. The emphasis is supplied.

62. See the cases cited *supra* note 56. See also United States v. Buckner, 108 F.2d 921, 926–927 (2d Cir.), cert. denied 309 U.S. 669, 60 S.Ct. 613, 84 L.Ed. 1016 (1940).

**330**

Our review of appellants' several claims against the test of the record thus fails to disclose error. The convictions are accordingly

Affirmed.

FAHY, Senior Circuit Judge, (concurring in affirmance):

In my view appellants should have been permitted to show the eventual repayment of the advance to Golf Contractors, Inc., discussed in Part III of the court's opinion. As the court points out, the notes were secured by deed of trust, arranged by appellants, on the Glen Haven property. The full circumstances of this transaction, of which the jury were permitted to have only a part, I think were relevant on the issue of criminality. I do not dissent, however, from affirmance, deeming this restriction upon the evidence not so harmful as to call for reversals.